**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

B AND T SUPPLIES, INC. d/b/a B AND T SUPPLY
d/b/a BIGGEST BOOK.COM, TZVI ODZER,
RUBEN AZRAK, RKDK INC. and GELATO ON
HUDSON LLC d/b/a HAAGEN DAZS, ASIA STAR
BROADCASTING INC., and DANIEL SHAH,
*individually and on behalf of those similarly situated*,

                Plaintiffs,

    v.

AG MORGAN TAX & ACCOUNTING LLC, AGM
CAPITAL FUND I, LLC, AGM CAPITAL FUND II
LLC, ALVIN HOLDINGS, LLC RICHARD K.
ARMON, BLUE STREAM INCOME FUND, LLC,
CAPE COD INCOME FUND, LLC, CAPRICORN
INCOME FUND I, LLC, CAPRICORN INCOME
FUND PARALLEL LLC, DANIEL A. CISTONE
LLC, ES EQUITY LLC, FRAN CASSIDY, GR8
INCOME FUND, LLC, ROBERT HUGHES, JADE
FUND, LLC, JAX FUND, LLC, JACALYN
KERBECK, LINDSAY BLAKE INC., LWM
EQUITY FUND LP, LWM INCOME FUND 2,
LLC, LWM INCOME FUND PARALLEL, LLC,
MARINER MCA INCOME FUND, LLC,
MATTHEW MILSTEAD, MCA CAPITAL FUND,
LLC, MCA CAROLINA INCOME FUND, LLC,
MCA NATIONAL FUND, LLC, MERCHANT
FACTORING INCOME FUND, LLC, MERCHANT
SERVICES INCOME FUND, LLC, MERCHANT
SERVICES INCOME FUND PARALLEL, LLC,
MID-ATLANTIC BROKERS, INC., MID-
ATLANTIC MCA FUND, LLC, M.K.ONE
INCOME FUND, LLC, DANIEL O'NEILL, PISCES
INCOME FUND, LLC, PISCES INCOME FUND
PARALLEL, LLC,  PTK FINANCIAL, LLC, RAZR
MCA FUND, LLC, RETIREMENT EVOLUTION
INSURED INCOME FUND LLC, SHERPA
INCOME FUND 1, LLC, SPARTAN INCOME
FUND, LLC SPARTAN INCOME FUND
PARALLEL, LLC, STFG INCOME FUND, LLC,
CAETRINA TALBOT, VICTORY INCOME
FUND, LLC, WELLEN FUND 1, LLC,
WORKWELL FUND I LLC, ALEC VAGNOZZI,

Civil Action No.: _____

ALBERT VAGNOZZI, DEAN J. VAGNOZZI,
GEMJ CHEBHEAR GRAT, LLC, JOSEF
CHEHEBAR, ISAAC SHEHEBAR, ECKERT
SEAMANS CHERIN & MELLOT, LLC and JOHN
J. PAUCIULO,

                 Defendants.

## CLASS ACTION COMPLAINT

Plaintiffs B and T Supplies, Inc. d/b/a B and T Supply d/b/a Biggest Book.com ("B&T"), Tzvi Odzer ("Odzer"), Ruben Azrak ("Arzak"), RKDK Inc. and Gelato on Hudson LLC d/b/a Haagen Dazs franchises (collectively "Haagen Dazs"), Asia Star Broadcasting Inc. ("ASB") and Daniel Shah ("Shah," collective "Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action lawsuit for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d) ("RICO"), predicated on the unlawful collection of debt and wire fraud, against Defendants AG Morgan Tax & Accounting LLC ("AG Morgan"), AGM Capital Fund I, LLC ("AGM"), AGM Capital Fund II LLC ("AGM II"), Alvin Holdings, LLC ("Alvin"), Richard K. Armon ("Armon"), Blue Stream Income Fund, LLC ("Blue Stream"), Cape Code Income Fund, LLC ("CC Fund"), Capricorn Income Fund I, LLC ("Capricorn"), Capricorn Income Fund I Parallel, LLC ("Capricorn Parallel"), Daniel A. Cistone LLC ("Cistone LLC"), ES Equity LLC, Fran Cassidy ("Cassidy"), GR8 Income Fund, LLC ("GR8"), Robert Hughes ("Hughes"), Jade Fund, LLC ("Jade"), Jacalyn Kerbeck ("Kerbeck"), Jax Fund, LLC ("Jax"), Lindsay Blake Inc. ("Lindsay Inc."), LWM Equity Fund LP ("LWM Equity"), LWM Income Fund 2, LLC ("LWM Fund"), LWM Income Fund Parallel, LLC ("LWM Parallel"), Mariner MCA Income Fund, LLC ("Mariner MCA"), Matthew Milstead ("Milstead"), MCA Capital Fund, LLC ("MCA Cap"), MCA Carolina Income Fund, LLC ("MCA Carolina"), MCA National Fund, LLC ("MCA National"), Merchant Factoring Income Fund, LLC ("Merchant Factoring"), Merchant

32195532v.3

Services Income Fund, LLC ("Merchant Services"), Merchant Services Income Fund Parallel, LLC ("Merchant Parallel"), Mid-Atlantic Brokers, Inc. ("Mid Atlantic"), Mid-Atlantic MCA Fund, LLC ("Mid-Atlantic MCA"), M.K.One Income Fund, LLC ("MK One"), Daniel O'Neill ("O'Neill"), Pisces Income Fund, LLC ("Pisces"), Pisces Income Fund Parallel, LLC ("Pisces Parallel"), PTK Financial, LLC ("PTK"), Razr MCA Fund, LLC ("Razr"), Retirement Evolution Insured Income Fund LLC ("Retirement Evolution"), Sherpa Income Fund 1, LLC ("Sherpa"), Spartan Income Fund, LLC ("Spartan"), Spartan Income Fund Parallel, LLC ("Spartan Parallel"), STFG Income Fund, LLC ("STFG"), Caetrina Talbot ("Talbot"), Victory Income Fund, LLC ("Victory"), Wellen Fund 1, LLC ("Wellen"), WorkWell Fund I LLC ("WW Fund"), Alec Vagnozzi ("Alec"), Albert Vagnozzi ("Albert"), Dean J. Vagnozzi ("Dean"), GemJ Chehebar Grat, LLC ("GemJ"), Josef Chehebar ("Josef"), Isaac Shehebar ("Isaac"), Eckert Seamans Cherin & Mellot, LLC ("Eckert") and John J. Pauciulo ("Pauciulo," collectively "Defendants") to obtain legal and equitable relief including restitution and injunctive relief for the Classes. As set forth herein, Defendants conspired with and materially participated by knowingly funding usurious loans collected by the Enterprise's via interstate ACH daily debits.

Plaintiffs make the following allegations based upon their personal knowledge, due investigation of their counsel, publicly filed criminal and civil charges brought by the United States Attorney for the Eastern District of New York, the United States Attorney for the Eastern District of Pennsylvania (collectively, the "DOJ"), and the Securities and Exchange Commission ("SEC"), the discovery and testimony derived from those lawsuits and dozens of other private lawsuits against the RICO Enterprise, as defined below, and facts that are publicly available.

## INTRODUCTION

### A.    The Purpose of this Action.

1.    This class action lawsuit seeks restitution and equitable relief for small businesses and their owners across the country who were financially ruined by an indicted RICO Enterprise involving Complete Business Solutions Group, Inc. d/b/a Par Funding ("CBSG") and its owner, convicted felon Joseph LaForte ("LaForte"), who, along with other RICO Persons, collected hundreds of millions of dollars of usurious debt from Plaintiffs and the class members between 2016 and July 2020.

2.    These victims collectively have lost hundreds of millions of dollars, many have had their businesses shuttered and others have lost customers due to the CBSG RICO Enterprise's unlawful collection tactics.

3.    To make matters much worse, many of these victims have had their lives threatened, their wives and children threatened and even been "visited" by LaForte's collection soldier, Gino Gioe, who has since pled guilty to four counts of collection through extortionate means. *See* Exhibit 22 introduced below.[1]  Others have been threatened to have their head split open and their houses blown up.

4.    Although the CBSG RICO Enterprise run by LaForte is currently subject to numerous civil actions by "mom and pop" investors and multiple SEC lawsuits, this civil class action lawsuit seeks redress for a different group of victims: the many thousands of merchant

---

[1] *See also* Jeremy Roebuck, *Reputed mob associate pleads guilty to threatening violence as an 'enforcer' for Philly-based business lender*, THE PHILADELPHIA INQUIRER, Sept. 8, 2022, https://www.inquirer.com/news/par-funding-renato-gino-gioe-charged-guilty-joseph-la-forte-20220908.html

32195532v.3

victims who have been terrorized by the Enterprise's collection of unlawful debt including the unlawful debt knowingly and purposely collected by the Receiver.

5.      On July 24, 2020, the Securities and Exchange Commission in the Southern District of Florida commenced an action against CBSG, its owners and operators and several CBSG investors, among other defendants, which was assigned case number 9:20-cv-812405-RAR (the "SEC Action").

6.      Thereafter, on July 27, 2020, the presiding judge in the SEC Action granted a motion to appoint a receiver to manage the assets of the corporate defendants (the "Receiver") for the "protection of investors." *See* SEC Action, DE 36.

7.      Neither the SEC nor the Receiver represent the interests of Plaintiffs here, who are the true victims of CBSG's criminal Enterprise. The Receiver's single-minded purpose has been to collect money—***including from CBSG's merchant crime victims***—in order to allow investors (some of them who knowingly invested in a company engaged in illegal, usurious lending practices) to recoup some of their investments in CGSG's usurious loans.

8.      Indeed, Defendants here are among the parties who are actively seeking recovery from the Receiver's Estate (the "Receivership Estate") even though these Defendants were co-conspirators with CBSG and the other SEC Action Defendants in knowingly funding criminally usurious loans.

9.      CBSG also fraudulently represented in interstate wires that the loans Defendants invested  in or solicited were merchant cash advance agreements ("MCA Agreements"), whereby CBSG falsely claimed they were not offering a loan but were merely purchasing merchants' receivables.  Many Defendants knew these representations were false as they were told by Enterprise members and other Defendants before investing in CBSG that it issued loans with

-5-

annual interest rates of at least 105%. In actuality, the interest rates were far higher, often exceeding 400%.

10.    The Defendants' cooperation in CBSG's twin aims of collecting unlawful debt and wire fraud can be thought of as two distinct sub-roles: (i) SPV Defendants, defined below, who invested their own and other persons' funds to fund CBSG's MCA Agreements that were usurious loans (the "Investor Defendants") and (ii) Defendants like Dean Vagnozzi, the Unlicensed Broker Defendants, the Chehebar Defendants and the Eckert Defendants, defined below (collectively, the "Marketing Defendants), who marketed and solicited the Investor Defendants to fund the usurious MCA Agreements.

11.    To date, the Receiver has knowingly collected over $240 million from criminally victimized merchants to pay investors, many of whom knowingly participated in the CBSG RICO Enterprise, and the Receiver (and his law firm) have been richly compensated for their services, receiving over $20 million in fees thus far.[2]

12.    Incredibly, even after the FBI raided CBSG and even after the SEC alleged in its complaint that CBSG was in the business of predatory lending that charged interest rates in excess of 400%, the Receiver for CBSG and certain investor agent funds continued to brazenly collect upon these unlawful debts.

13.    The Receiver's single-minded focus of recovering money to give to the Investor Defendants—who are co-conspirators who knowingly invested in CBSG's criminally usurious loans for a return on said investment—has resulted in the Receiver exclusively granting recovery

---

[2]  The Receiver has—based on its own status report filed on November 27, 2023—approved $240 million in investor claims and only $10 million in non-investor claims. *See* SEC Action at DE 1759 at 3-4.

to entities like the Investor Defendants while simultaneously ***denying every claim brought by CBSG's victim merchants and their owners***.

14.     The Receiver has also (and knowingly) stepped into the shoes of CBSG and is presently collecting on the indisputably unlawful debts by **continuing to debit victim merchants' accounts pursuant to the MCA Agreements Defendants funded that those merchants entered into with CBSG in order to gain more funds for to pay himself and investors like Defendants who conspired with CBSG to fund these usurious loans.**

15.     Thus, many Defendants, with the Receiver's help, continue to collect—*to this day*—on these knowingly unlawful debts issued by CBSG against merchant victims like Plaintiffs from states across the country that prohibit usurious commercial lending.

16.     Defendants do so even in the face of a landslide of precedent from this judicial district and the Second Circuit, holding that the same form instruments used by the CBSG RICO Enterprise are loans as a matter of law in violation of RICO.  *See, e.g.*, *Lateral Recovery, LLC v. Cap. Mech. Servs. LLC.*, 632 F. Supp. 3d 402 (S.D.N.Y. 2022); *Fleetwood Servs., LLC v. Richmond Capital Grp. LLC*, 2023 U.S. App. LEXIS 14241 (2d Cir. June 8, 2023).

17.     The Receiver continued to collect against these merchant victims even after he had subjected his own attorneys to physical harm when LaForte ordered his brother James Laforte, a made member of an organized crime family, to send a message to the Receiver in the "SEC Action by "attacking him with a metal object, sending him to the hospital and requiring seven stables to his head."[3]

---

[3] *See* **Exhibit 1 -** Joseph D. Stefano and Jeremy Roebuck, *Par Funding Founder's Brother Charged with Attacking Attorney*, THE PHILADELPHIA INQUIRER, Mar. 6, 2023, available at https://www.inquirer.com/news/par-funding-james-laforte-arrest-gaeton-alfano-receiver-20230306.html (last visited Dec. 27, 2023).

18.     This violent act by the CBSG RICO Enterprise and others led to a 63-count Grand Jury indictment against CBSG, LaForte and his other co-conspirators for, among other things, "use of extortionate means . . . to collect an extension of credit."  The Grand Jury indictment also included four counts of perjury in cases involving merchant victims of the Enterprise.  *See* **Exhibit 2** ¶ 15 (Count 22).

19.     Unphased by this wide-ranging criminal indictment supported by records turned over by the Receiver himself, the Receiver continued to collect upon the unlawful debts for the benefit of investors like Defendants (not to mention the exorbitant fees he was charging those very same investors) even after a second Grand Jury indictment was rendered in the Eastern District of New York. Similar to the Pennsylvania one the New York indictment charged members of the CBSG RICO Enterprise with, among other things, RICO and RICO conspiracy, extortion, bid rigging, money laundering and witness intimidation.

20.     The Receiver continued its unrelenting pursuit of money for investors even after the SEC filed a copy of these indictments on the docket in the SEC Action to put all parties on notice of the criminal nature of the CBSG RICO Enterprise, and even after numerous courts concluded that similar MCA agreements were criminally usurious loans violating RICO's prohibition on the collection of unlawful debt.  *See* SEC Action at ECF#1569-1, filed on May 23, 2023; *see also Fleetwood Servs., LLC v. Richmond Capital Grp. LLC*, 2023 U.S. App. LEXIS 14241 (2d Cir. June 8, 2023).

**B.     The Investor Targets of this Action.**

21.     The Enterprise solicited and received investment funds from Defendants here to provide capital for these usurious loans disguised as MCA Agreements.

-8-

22.     Investigations resulting in lawsuits filed by the DOJ and SEC (and discovery therefrom), innumerable private lawsuits, New York confession of judgment records as well as marketing materials prepared by the RICO Enterprise *all* demonstrate that the monies collected by the CBSG RICO Enterprise (consisting of unlawful debt, usurious interests and unconscionable fees) enriched the following—while commensurately ruining the financial wellbeing and lives of Plaintiffs and the Class Members:

   a. Joseph LaForte and other Enterprise members who ran the unlawful lending through CBSG;

   b. The captain of the organized crime family James LaForte belonged to;

   c. The Enterprise's marketing wing run primarily through Defendant Dean Vagnozzi and his company ABetterFinancialPlan.Com d/b/a A Better Financial Plan ("Better Financial Plan"), which solicited Defendants to provide funds for the explicit purpose of funding loans with annual interest rates of at least 105%;

   d. Investor Defendants who knowingly financed these loans with unlawful interest rates because the Enterprise promised—and delivered—"double digit investment growth" in return for Defendants' funding these MCA Agreements explicitly and repeatedly described by the Enterprise's marketing teams "loans" with 35% returns in 100 days or less (resulting in annualized returns of at least 105%), violating various State's usury laws, including Florida's where the Enterprise operated; and

   e. The attorneys, namely Defendants Eckert and Pauciulo, who advised the Defendant Investors to fund and participate in the RICO Enterprise with full knowledge of LaForte's extensive criminal background and its purpose to fund criminally usurious loans.[4]

23.     In order to fund these extortionate and usurious loans disguised as MCA Agreements, CBSG relied on its Marketing Defendants—such as Dean—to lay the scheme bare to the Investor Defendants in the Marketing Defendants' promotional materials:

   "In short, merchant cash advance **lenders** provide growth opportunity **loans** to small businesses," of which Plaintiffs were just several of thousands of businesses across the nation since 2012 that did business with the Enterprise, "with 35% interest rates."

---

[4] *See* **Exhibit 3** (SEC Consent Order against Pauciulo).

24.    During numerous marketing pitches (typically held at high-end restaurants), Investor Defendants were routinely told they were investing in "**loans**" anywhere "between $5,000 to $250,000, usually [funded] within 48 hours," while shown the below slide:



25.    The video was presented by Defendant Dean J. Vagnozzi, who has owned and managed a Better Financial Plan since 2012 to market the Enterprise's loans.

26.    Investor Defendants further understood from Vagnozzi's presentation that the loans had a fixed duration because they were told by Marketing Defendants before investing that the "**loans** are usually paid back to the merchant cash **lender** within **100 days** and are done so utilizing an ACH transaction," while the below image appeared on the screen before the Investor Defendants.



27.     "So, in other words," the Investor Defendants were told as the above slide was shown, "the merchant cash advance **lender automatically withdraws a payment every single business day from the borrowing company**. These payments are typically 5-10% of the Borrower's available cash.  And again, the **loan** is usually paid off **in full** in less than **100 days**."

28.     The CBSG RICO Enterprise then asked the Investor Defendants, rhetorically, "so why would any company **pay such a high interest rate?**"  Answer: "Remember, these are opportunistic business **loans** . . . these small companies are not worried about **the high interest rate** that the money will cost them."

29.     The CBSG RICO Enterprise then explained to the Investor Defendants that once the borrower enters into the first MCA Agreement these loans are refinanced and extended with higher amounts of repayment and interest, up to three times per year per borrower, that would generate annual profits of 70% to 90% through the Enterprise's unlawful debt collection, as reflected by the slide below:



30.     The above slide and disclosed interest rate made it clear to the Investor Defendants that they would be funding loans repaid within 100 days and would, in total, constitute three such loans to the same borrower, each with 35% interest (annualized more than 105%).

-11-

31.     Consequently, the Investor Defendants knew they would be funding loans taken out by borrowers with annualized interest rates of at least **105%**. This practice violates the commercial usury laws of every single state that has one, including Florida where the Enterprise operated out of and the states where each Plaintiff resides.

32.     Additionally, whereas the Investor Defendants were told they were investing in loans with annual interest rates of at least 105%, these same MCA Agreements represented to borrowers—including those entered into by Plaintiff B&T with the CBSG RICO Enterprise, one of which is attached hereto as **Exhibit 4**, and refinanced over-and-over again in order to avoid default, confession of judgments being filed[5] and threats by the Enterprise's enforcers—that:

b.   The Purchase Price is being paid in exchange for the purchase and sale of the Receivables and is not intended to be, nor shall it be construed as, a loan from Purchaser to Merchant Seller. Merchant Seller agrees and acknowledges that the Purchase Price represents the fair market value of the Receivables. Purchaser has purchased and shall own all the Receivables up to the total RPA as the Receivables are created.  Payments made to Purchaser towards the total RPA shall be conditioned upon (i) Merchant Seller's sale of products and/or services and (ii) the payment of such goods and/or services to Merchant Seller by its customers pursuant to the terms of this Purchase Agreement.

c.   In no event shall any amounts paid to or received by Purchaser (or any portion of any such amount) be construed as or considered to be interest (with the exception of any interest awarded pursuant to any judgment entered against Merchant Seller for a breach of this Purchase Agreement). In the event that any court of competent jurisdiction determines that Purchaser has improperly charged or received interest under this Purchase Agreement and that said amount is in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and Purchaser shall promptly refund to Merchant Seller any interest Purchaser received in excess of the maximum lawful rate.  It is Merchant Seller's intent that it not pay or contract to pay and that Purchaser not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant Seller under applicable law.

---

[5] Notably, in light of practices by the Enterprise and other MCA players, New York has passed a bill to prohibit the use of confessions of judgment against businesses, like Plaintiffs, located outside of New York.  *See* Zeke Faux and Zachary Mider, *U.S. Urged to Stop Predatory Lenders 'Crippling' Businesses*, BLOOMBERG LAW, June 26, 2019, *available at* https://www.bloomberg.com/news/articles/2019-06-26/u-s-must-stop-predatory-small-business-loans-velazquez-says.  Many of the confessions of judgment filed by the Enterprise against class members were forged, a sample of which are attached hereto as **Exhibit 5**.

33.     "So where do you think many merchant cash advance **lenders** get the money to give to **borrowers**?" Vagnozzi asked Defendants.  "They get the money from investors like you, that's where.  Because they are making such large [70%-90% annual] profits, the merchant cash advance **lenders** can afford to pay you an extremely rate of return.  Generally, between 8 and 14 percent," as reflected by the below slide the Enterprise presented to Defendants.



34.     "Now that [Defendants] have a good understanding of the industry," A Better Business Plan invited the Investor Defendants to invest in "one of the best merchant cash advance **lenders** that you can find, we've partners with this extremely profitable, Philadelphia-based **lender** [CBSG] to allow sophisticated investors the opportunity to get fantastic investment returns, secured by the time of this recording, over **$120 million dollars** in collections that they [CBSG] having coming due over the next 100 days alone."

35.     Defendants  understood that these were secured loans because each MCA Agreement came with a security agreement that gave the Enterprise a UCC lien on virtually all of the borrower's business assets should there be a default.

36.     Investor Defendants were told by Marketing Defendants that CBSG had a default rate of less than 1% on its loans.

-13-

37.     The only way CBSG was able to keep its "default rate of less than 1%" was by the Enterprise unlawfully ensuring the MCA loans were always repaid by, among other racketeering acts: (i) wire fraud by over-debiting the Class's bank accounts through the ACH program described to Defendants; (ii) filing thousands of fraudulent and forged confessions of judgment against the Class; and (iii) making written and in-person threats of physical violence to Plaintiffs and Class members if they did not repay the loans Defendants funded.

38.     Investor Defendants were not simply direct retail investors in the loans; rather, they were individual and entity brokers and investment vehicles who solicited funds from non-Defendant investors that did not understand and were not privy to the complete picture of the Enterprise's activities, and then provided those funds and their own to the Enterprise after the above presentation and others like them given by the Enterprise convinced Investor Defendants to fund usurious loans in exchange for an 8 to 14 percent return on investment.

39.     Defendants raised hundreds of millions of dollars for the CBSG RICO Enterprise's usurious loans, as reflected by CBSG's SEC Form D filing dated November 26, 2019, attached hereto as **Exhibit 6**, A Better Financial Plan and just a fraction of Defendants, namely AG Morgan, Lindsay Inc.,[6] Alvin, Talbot, Cistone LLC, O'Neill, ES Equity, Cassidy, Kerbeck, Mid-Atlantic, Milstead, PTK, Armon, and Hughes (collectively the "Unlicensed Broker Defendants"), were able to raise funds for $227,232,019 in "Debt Securities", i.e., the MCA Agreements issued by the Enterprise, in 2019 alone.

40.     Other Defendants—consisting of special purpose vehicle "Agent Funds" of the Enterprise, as described by the SEC in the SEC Action—AGM, AGM II, Blue Stream, CC Fund, Capricorn, Capricorn Parallel, GR8, Jade, Jax, LWM Equity, LWM Fund, LWM Parallel, Mariner

---

[6] Miswritten as "Lindey Blake Inc." in the Form D.

MCA, MCA Cap, MCA Carolina, Merchant Factoring, Merchant Services, Merchant Parallel, Mid-Atlantic MCA, MK One, Pisces, Pisces Parallel, Razr, Retirement Evolution, Sherpa, Spartan, Spartan Parallel, STFG, Victory, Wellen and WW Fund (collectively the "SPV Defendants"), were feeder funds that were not owned by the Enterprise, but who funded the Enterprise's usurious loans after being convinced by the above-described marketing materials prepared by the Enterprise to participate in their scheme to collect unlawful debt.

41.     For example, as alleged by the SEC, SPV Defendants Pisces, Pisces Parallel, Capricorn, Capricorn Parallel, Merchant Services, and Merchant Parallel alone "raised more than $500 million from investors nationwide through a network of so-called 'Agent Fund Managers' who operated their own securities offerings in an orchestrated effort to funnel investor money to CBSG in exchange for CBSG promissory notes."  *See* Complaint for Injunctive and Other Relief in *SEC v. Westhead et al.*, 1:23-cv-23749-RKA (S.D. Fl.), attached hereto as **Exhibit 7**, ¶ 1.

42.     Defendants Alec and Albert Vagnozzi (collectively, the "Vagnozzis") owned and operated Pisces, Pisces Parallel, Capricorn and Capricorn Parallel, along with other co-conspirators.  Ex. 5, ¶¶ 12-17.

43.     And Defendants GemJ Chehebar Grat, LLC ("GemJ") and its Manager Josef Chehebar ("Chehebar") and his relative Isaac Shehebar (collectively, the "Chehebar Defendants") entered into a consulting agreement with CBSG in January 2017 for the purpose of "establishing contact with potential investors," such as the SPV Defendants.

44.     In total, the Unlicensed Broker Defendants, SPV Defendants, and the Chehebar Defendants[7] raised hundreds of millions of dollars for the Enterprise to use for the explicit and

---

[7] Notably, the Chehabar Defendants have been an active participant in the SEC Action and have asserted $50 million in liens over the Receivership assets and have thus continued to encourage

knowing purpose of funding usurious loans with annual interest rates of at least 105% to victimized small business across the United States.

45.     But the Class Members the Enterprise lent to using Defendants' investments experienced no "growth" from these loans.  Instead, they were ruined by the Enterprise collecting unlawful debt; these interest rates often exceeded 105% annually and were frequently as high as 400%.

46.     As a direct result, Class members who entered into the loans funded by Defendants could not keep up with the usurious interest rates known to Defendants. And since 2018, the Enterprise has filed nearly 2,500 confessions of judgment against its small business victims and their individual owners.

47.     Over 1,100 were filed in the State of New York, and thousands of others were filed across the United States.  With each confession of judgment, a small business and its owner(s) were financially ruined, with both business and personal bank accounts frozen or emptied for the benefit of the Enterprise and Defendants.

48.     And then there is the wire fraud.  As referenced above, the Defendants were told repeatedly by the Enterprise before buying into the scheme that the MCA Agreements were loans and would be drawn upon by the Enterprise's own hands in Philadelphia and Florida from merchants' bank accounts across the country via interstate daily ACH debits.

49.     To be sure, the SPV Defendants and Chehebar Defendants were sophisticated funders and the Unlicensed Broker Defendants had been practicing in the seedy MCA industry that arose from the wreckage of the 2009 market crash as a new device by which to defraud the

---

the Receiver to collect upon the unlawful debts at issue, including from Plaintiffs in order to repay the Chehebars.

vulnerable for several years by the time the Enterprise was formed in 2012, right after LaForte going out of jail for other financial crimes related to predatory lending practices. *See* Ex. 1.

50.     Defendants knew and understood they would be funding usurious loans that would be described to "borrowers" across the United States as "Merchant Cash Advance Agreements."

51.     Defendants conducted due diligence into the MCA Agreements and reviewed the boilerplate form CBSG would use with the thousands of borrowers, like Plaintiffs and the Class Members.

52.     In reviewing the MCA Agreements, Defendants saw that the agreements were written in a way that contradicted the marketing materials the Enterprise provided that repeatedly described the investments as loans with interest rates of 105% annually.

53.     Defendants saw that Sections 5 (a) and (c), reproduced above, were a complete lie because the MCA Agreements disclaimed they were not loans and no interest rate was being assessed.

54.     They saw that the MCA Agreements completely hid the fact from the borrower that they were entering into a loan with an annual interest rate of at least 105%, as made plain from the sham language below contained in every MCA Agreement Defendants funded:

**u.**   **Purchase Agreement.**  This Agreement for the Purchase and Sale of Future Receivables, any and all documents executed in connection herewith as a condition precedent to its effectiveness, and any and all exhibits incorporated herein by reference.

55.     In the 6-minute video by A Better Business Plan, where all the above Enterprise marketing slides were derived, attached hereto as **Exhibit 8**—one of several that the Enterprises' marketing members had for the Defendants to browse before buying into the scheme—the word "receivable" is not mentioned once, but the word "loan" is mentioned dozens of times.

32195532v.3

56.     As reflected in the slide below Paragraph 13 above, Defendants knew that these fraudulent loans would be drawn down upon from a bank account of the borrowers, i.e., the Plaintiffs and the Class, through the Enterprise's use of interstate ACH debits.

57.     Defendants knew from their due diligence that the MCA Agreements would be Docusigned by the Class Members after being emailed across state lines from the Enterprise's headquarters in Philadelphia and Florida, to states where the criminal usury rate was well below 35% and certainly below 105% annually, like Massachusetts, New York, New Jersey, California, Texas, Tennessee and Florida, for these type of business loans, and all fifty States that prohibit fraud.

58.     Yet Defendants funded them anyway because they wanted their "8%-14%" piece of the Enterprise's scheme. Plaintiffs and the Class Members were duped into usurious loans fraudulently disguised as MCA Agreements that charged interest rates not just at 35% or even 105%, but 400%, and in the case of innumerable in the Class, in excess of 4-5 figures annually of interest.

59.     To this day, Defendants continue their efforts to obtain portions of the unlawful debt the Enterprise collected on these fraudulent loans by making applications for recovering monies from the Receiver in the SEC Action—they just have not gone so far as to bash an attorney working for the Receiver on the head with a metal object like James LaForte did, but they, like James LaForte, are trying to collect nonetheless.

60.     Plaintiffs bring this class action to recompense the many thousands of similarly situated victims that have been preyed upon by the Enterprise using Defendants' funds through the Enterprise's and Defendants' joint conspiracy to fund and collect upon unlawful debt and commit wire fraud.

## THE PARTIES

61.     Plaintiff B&T Supplies, Inc. ("B&T") is a corporation organized and existing under the laws of New York with a principal place of business in Cedarhurst, New York.

62.     Plaintiff Tzvi Odzer ("Odzer") is an adult resident and citizen of New York and owner of B&T.

63.     Plaintiff Ruben Azrak ("Azrak") is an adult resident and citizen of New York.

64.     Plaintiff RKDK Inc. ("RKDK") is a corporation operating under the laws of New Jersey d/b/a a Haagen Dazs franchise with a principal place of business in Somerset, New Jersey.

65.     Plaintiff Gelato on Hudson LLC ("Gelato") is a limited liability company operating under the laws of the State of New Jersey d/b/a a Haagen Dazs franchise with a principal place of business in Somerset, New Jersey (collectively, with RKDK, "Haagen Dazs").

66.     Plaintiff Asia Star Broadcasting Inc. ("ASB") is a family-owned S Corporation operating under the laws of the State of New Jersey, with its principal place of business in Edison, New Jersey.

67.     Plaintiff Daniel Shah ("Shah") is an adult resident and citizen of New Jersey and at all relevant times was the owner of RKDK and Gelato, which owned and operated two Haagen Dazs franchises in New Jersey and a minority owner of ASB.

68.     Defendant AG Morgan Tax & Accounting LLC ("AG Morgan") is an Unlicensed Broker Defendant and New York Limited Liability Company with a principal place of business in Massapequa, New York.

69.     Defendant AGM Capital Fund I, LLC ("AGM") is an SPV Defendant and New York Limited Liability Company with a principal place of business, upon information and belief, in New York, New York.

32195532v.3

70.     Defendant AGM Capital Fund II LLC ("AGM II") is an SPV and Delaware Limited Liability Company with a principal place of business, upon information and belief, in Dover, Delaware.

71.     Defendant Alvin Holdings, LLC ("Alvin") is an Unlicensed Broker Defendant and Texas Limited Liability Company with, upon information and belief, a principal place of business in Plano, Texas.

72.     Defendant Richard K. Armon ("Armon") is an Unlicensed Broker Defendant and, upon information and belief, a resident of Radnor, Pennsylvania.

73.     Defendant Blue Stream Income Fund, LLC ("Blue Stream") is an SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Wilmington, Delaware.

74.     Defendant Cape Cod Income Fund, LLC ("CC Fund") is an SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Wilmington, Delaware.

75.     Defendant Capricorn Income Fund I, LLC ("Capricorn") is an SPV Defendant and Delaware Limited Liability Company formed in May 2018 and operated out of Media, Pennsylvania that has never been registered with the SEC in any capacity.

76.     Defendant Capricorn Income Fund I Parallel, LLC ("Capricorn Parallel") is an SPV Defendant and Delaware Limited Liability Company formed in May 2020 and operated out of Media, Pennsylvania that has never been registered with the SEC in any capacity.

77.     Defendant Daniel A. Cistone LLC ("Cistone LLC") is an Unlicensed Broker Defendant and Pennsylvania Limited Liability Company with, upon information and belief, a principal place of business in Southampton, Pennsylvania.

-20-

78.     Defendant ES Equity LLC ("ES Equity") is an Unlicensed Broker Defendant and, upon information and belief, a New Jersey Limited Liability Company with, upon information and belief, a principal place of business in New Jersey.

79.     Defendant Fran Cassidy ("Cassidy") is an Unlicensed Broker Defendant and, upon information and belief, a resident of Ardmore, Pennsylvania.

80.     Defendant GR8 Income Fund, LLC ("GR8") is an SPV Defendant and Delaware Limited Liability Company operated with, upon information and belief, a principal place of business in Delaware.

81.     Defendant Robert Hughes ("Hughes") is an Unlicensed Broker Defendant and, upon information and belief, a resident of Wyndmoor, Pennsylvania.

82.     Defendant Jade Fund, LLC ("Jade") is an SPV Defendant and North Carolina Limited Liability Company with, upon information and belief, a principal place of business in North Carolina.

83.     Defendant Jacalyn Kerbeck ("Kerbeck") is an Unlicensed Broker Defendant and, upon information and belief, a resident of Boca Raton, Florida.

84.     Defendant Jax Fund LLC ("Jax") is an SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Delaware.

85.     Defendant Lindsay Blake Inc. ("Lindsay Inc.") is an Unlicensed Broker Dealer and corporation formed, upon formation and belief, under the laws of the State of Delaware, with its principal place of business in New Jersey.

86.     Defendant LWM Equity Fund, L.P. ("LWM Equity") is an SPV Defendant and Delaware Limited Partnership with, upon information and belief, a principal place of business in Delaware.

87.     Defendant LWM Income Fund 2, LLC ("LWM Fund") is an SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Delaware.

88.     Defendant LWM Income Fund Parallel, LLC ("LWM Parallel") is an SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Delaware.

89.     Defendant Mariner MCA Income Fund, LLC ("Mariner MCA") is an SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Delaware.

90.     Defendant Matthew Milstead ("Milstead") is an Unlicensed Broker Defendant and, upon information and belief, a resident of Herndon, Virginia.

91.     Defendant MCA Capital Fund LLC ("MCA Cap") is an SPV Defendant and New York Limited Liability Company with, upon information and belief, a principal place of business in New York.

92.     Defendant MCA Carolina Income Fund, LLC ("MCA Carolina") is an SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Delaware.

93.     Defendant MCA National Fund, LLC ("MCA National") is an SPV Defendant and New Jersey Limited Liability Company with, upon information and belief, a principal place of business in Pennsylvania.

94.     Defendant Merchant Factoring Income Fund LLC ("Merchant Factoring") is an SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Delaware.

-22-

95.     Defendant Merchant Services Income Fund, LLC ("Merchant Services") is an SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Pennsylvania and has never been registered with the SEC in any capacity.

96.     Defendant Merchant Services Income Fund Parallel, LLC ("Merchant Parallel") is an SPV Defendant and Delaware Limited Liability with, upon information and belief, a principal place of business in Pennsylvania and has never been registered with the SEC in any capacity.

97.     Defendant Mid-Atlantic Brokers, Inc. ("Mid-Atlantic") is an Unlicensed Broker Defendant and corporation formed under the laws of the State of Delaware with, upon information and belief, a principal place of business in Delaware.

98.     Defendant Mid-Atlantic MCA Fund LLC ("Mid-Atlantic MCA") is an SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Delaware.

99.     Defendant M.K.One Income Fund LLC ("MK One") is an SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Delaware.

100.    Defendant Daniel O'Neill ("O'Neill") is an Unlicensed Broker Defendant and, upon information and belief, a resident of Pennsylvania.

101.    Defendant Pisces Income Fund, LLC ("Pisces") is an SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Pennsylvania.

102.    Defendant Pisces Income Fund Parallel, LLC ("Pisces Parallel") is an SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Pennsylvania.

103.     Defendant PTK Financial, LLC ("PTK") is an Unlicensed Broker Defendant and Pennsylvania Limited Liability Company with, upon information and belief, a principal place of business in Pennsylvania.

104.     Defendants Razr MCA Fund, LLC ("Razr") is an SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Delaware.

105.     Defendant Retirement Evolution Insured Income Fund, LLC is SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Delaware.

106.     Defendant Sherpa I Income Fund LLC ("Sherpa") is an SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Arizona.

107.     Defendant Spartan Income Fund, LLC ("Spartan") is an SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Delaware.

108.     Defendant Spartan Income Fund Parallel, LLC ("Spartan Parallel") is an SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Delaware.

109.     Defendant STFG Income Fund, LLC ("STFG") is an SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Delaware.

110.     Defendant Caetrina Talbot ("Talbot") is an Unlicensed Broker Defendant and, upon information and belief, resident of Arizona.

-24-

111.    Defendant Victory Income Fund, LLC ("Victory") is an SPV Defendant and, upon information and belief, a Delaware Limited Liability Company with a principal place of business in Delaware.

112.    Defendant Wellen Fund 1, LLC ("Wellen") is an SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Pennsylvania.

113.    Defendant WorkWell Fund I LLC ("WW Fund") is an SPV Defendant and Delaware Limited Liability Company with, upon information and belief, a principal place of business in Delaware.

114.    Defendant Alec Vagnozzi is an individual and owner and operator of one-or-more of the SPV Defendants and is a resident of Pennsylvania.

115.    Defendant Albert Vagnozzi is an individual and owner and operate of one-or-more of the SPV Defendants and is a resident of Pennsylvania.

116.    Defendant Dean J. Vagnozzi ("D. Vagnozzi") is an individual and resident of Pennsylvania and is the sole owner of Better Financial Plan.

117.    Defendant GemJ Chehebar Grat, LLC ("GemJ") is a Chehebar Defendant and Delaware Limited Liability Company.

118.    Defendant Josef Chehebar ("Josef") is a Chehebar Defendant and an individual and resident of New York and a Manager of GemJ.

119.    Defendant Isaac Shehebar ("Isaac") is Chehebar Defendant and an individual and resident of New York.

-25-

120.    Defendant Eckert Seamans Cerin & Mellot, LLC ("Eckert") is a law firm and Pennsylvania Limited Liability Company with its principal place of business in Pittsburg, Pennsylvania and with offices in New York.

121.    Defendant John J. Pauciulo ("Pauciulo") is a former partner of Eckert and an individual and resident of Pennsylvania.  Pauciulo and Eckert are collectively defined as the "Eckert Defendants."

## JURISDICTION

122.    Each Defendant is subject to the personal jurisdiction of this Court because each Defendant knew the CBSG usurious loans containing fraudulent statements would be issued to New York residents and that the scheme Defendants agreed to participate in would harm New York residents.  In addition, several Defendants are either residents or domiciled in New York or do substantial business and/or have a physical office in New York including, but not limited to, (i) AGM; (ii) AGM Morgan; (ii) Josef Chehebar; (iii) Isaac Shehebar; (iv) Eckert; (v) MCA Cap; and (vi) Lindsay Inc.  Furthermore, more than 1,100 confessions of judgment were filed using the New York Court System to further the goals of the Enterprise.

123.    This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 because Plaintiffs allege violations of federal law, namely, for conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961-68 ("RICO").

124.    This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because (i) at least one member of the Class is a citizen of a different state than Defendants, (ii) the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and (iii) none of the exceptions under that subsection apply to this action.

125.    This Court has subject-matter jurisdiction over Plaintiffs' equitable relief claim because it is so related to Plaintiffs' federal claim that it forms part of the same case or controversy under Article III of the United States Constitution.

126.    Venue is proper because Defendants knew that the MCA Agreements they were investing in as usurious loans would be issued to numerous merchants and their owners in New York, such as Plaintiffs B&T and its owner Odzer, and numerous Defendants reside and do business in New York.

## COMMON FACTUAL ALLEGATIONS

A.    **Background on States' Usury Laws**

127.    More than a dozen states including, but not limited to, New York, Florida, Texas, California, Colorado, Tennessee, Michigan and Massachusetts, place limits below 50% per annum on interest rates that can be charged in connection with providing a loan.  The loans charged by the Enterprise had interest rates in excess of 100% per annum.

128.    As recognized by the Founding Father and former Chief Justice of the United States Supreme Court John Marshall:

> The ingenuity of lenders has devised many contrivances, by which under forms sanctioned by law, the statute may evaded. . . . Yet it is apparent, that if giving this form to the contract will afford a cover which conceals it from judicial investigation, the statute would become a dead letter.  Courts, therefore, perceived the necessity of disregarding the form, and examining the real nature of the transaction.

*Scott v. Lloyd*, 34 U.S. 418, 446-447 (1835).

129.    Carrying Chief Justice Marshall's torch, in 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses like the Plaintiffs and Class merchants.

130. As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the Governor's and public's attention the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders, like the Enterprise, to enforce payments.

131. As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest, in New York's case, interest greater than twenty-five percent.

132. Consequently, New York and other states passed usury laws that prohibit interest rates well ***below* 35%, and all such states prohibit annual interest rates of 105%**.   For example:s:

    a. New York making it criminally usurious for a commercial business loan of less than $2.5 million to charge an annual interest rate in excess of 25%, N.Y. Penal Law § 190.40;

    b. California's criminal threshold for usury is the higher of 10%, or 5% plus the prevailing rate of the Federal Reserve Bank,[8] *see* CA Stats. 1919 p. lxxxiii, § 2, and Stats. 1919, p. lxxxiii, § 3, and Article XV, § 1 of the California Constitution;

    c. Texas law states that loans such as the MCA Agreements funded by Defendants can, at most, assess an interest rate of 28%, Tex. Fin. Code § 303.009(c);

---

[8] Which ranged from 0.36% at the beginning of the Enterprise's reign in 2016 and fell to 0.09 in August 2020, at the time of the Enterprise's demise when Laforte was indicted after the DOJ raid on his home and CBGS' offices discovered that he, as a convicted felon, was illegally possession firearms.   Press Release, United States Attorney Office, Eastern District of Pennsylvania, Philadelphia Cash Advance Business Owner Indicted and Detained on Weapon Charges (Aug. 12, 2020), *available at* https://www.justice.gov/usao-edpa/pr/philadelphia-cash-advance-business-owner-indicted-and-detained-weapons-charges

-28-

d. Florida law makes it illegal to receive interest on a loan such as the MCA Agreements that exceeds 25%, Fla. Stat. § 687.071;

e. Massachusetts makes it illegal to assess an interest rate of more than 20% on loans like that of the MCA Agreements, *see* Mass. Gen. Laws ch. 371 § 249(a);

f. Colorado law renders any annual interest rate greater than 45% on a loan to be subject to criminal usury, C.R.S. 18-15-104(2);

g. Michigan law renders any annual interest rate greater than 25% to be criminally usurious, M.C.L.S. § 438.41;

h. Tennessee allows a maximum of 10% interest on loans greater than $1,000, Tenn. Code Ann. § 47-14-103 and

i. New Jersey law prohibits loans to corporations with interest rates exceeding 50% per annum, N.J. Stat. § 2C:21-19.

**B.**     **The Unlawful RICO Activity**

**a. *Unlawful Collection of Debt***

133.     Despite these usury laws, as reflected in the Enterprise's Form D filing for CBSG's funding operations, the Unlicensed Broker Defendants solicited and contributed funds from investors in all of these states with usury laws capping interest rates well below 35% and 105%, Ex. 4, as did the SPV Defendants and Chehebar Defendants as well.

134.     Like the conduct contemplated by Justice Marshall nearly 200 years ago and proscribed by states such as New York, Florida, Texas, California, Colorado, Michigan, Massachusetts and others, the MCA Agreements that Marketing Defendants solicited Investor Defendants to fund and were entered into by Class victims like Plaintiffs were complete and utter shams designed to evade the usury laws of various States, including Florida where the Enterprise had its principal place of business.

135.     Defendants knew this because before deciding to invest they were told upfront that the Enterprise treat their MCA Agreements as absolutely repayable loans with annual interest rates

-29-

of at least 105% given that each loan carried a 35% interest rate over a term of less than 100 days and refinanced with the same borrower at least three times per year.

136.    And even if the Enterprise had not been so brazen and explicit in explaining their scheme to Defendants as to how these loans would be funded and what interest rates would be charged, the MCA Agreements would still be construed as loans because they contain all of the fundamental hallmarks of a loan including, but not limited to:

    a. The Enterprise had full recourse to demand full accelerated repayment of the MCA Agreement loan in the event of a Class merchant's bankruptcy, Ex. 2 § 10(j), and had further recourse against the Class guarantors to hold them liable as well if the Class merchant declared bankruptcy;

    b. While the MCA Agreements purportedly had reconciliation provisions, the Enterprise ensured—as Defendants knew—that this provision was a sham because the Enterprise could and did arbitrarily deny all reconciliation requests per its "sole discretion" right thereof embedded in small print in the MCA Agreement;

    c. The Enterprise's MCA Agreements all had fixed terms readily determinable by simply dividing the repayment amount by the fixed daily remittances, The Enterprise even made this all the more obvious by placing the term front-and-center in the loan:

| | |
|---|---|
| **Purchase Price** | $500,000.00 |
| **Specified Percentage** | 10% |
| **Daily Specified Amount** | $8,250.00 |
| **Amount of Days** | 80 |
| **Receivables Purchased Amount** | $660,000.00 |
| **Estimated Final Receipt Date** | 80 DAYS FROM DATE OF FUNDING |

    d. Missing just four fixed daily payments in the course of the loan's term resulted in default with full acceleration and the Enterprise being able to collect through either (i) direct debiting the entire balance from the Class's bank accounts; (ii) filing confessions of judgment against the Class; (iii) taking a security interest in the entire merchant's assets and/or (iv) holding the merchant's owner/guarantor responsible for the balance.  *See* Ex. 2 at 26 and § 11.

    e. The loans, despite being sold to the Class Members as a purchase of receivables, never identified any of the specific receivables the Enterprise was purchasing, which would come as no surprise to Defendants since they knew these were loans;

f. Despite the Enterprise purportedly purchasing "Future Receivables" from the Class merchants, it was the Class merchants, not the Enterprise, who were responsible for collecting these presumably already purchased "Future Receivables" and depositing them into the designated bank account from which the Enterprise would draw the ACH debits, *see* Ex. 2 § 7 (a) ("Merchant Seller shall deliver the Receivables to Purchaser by making Payments to Purchaser pursuant to the terms of this Purchase Agreement") & (c) ("Merchant shall ensure that funds adequate to cover any and all amounts to be debited by Purchaser are in the Account . . . . when the Debit is scheduled to be made"); and

g. While the Enterprise represented that the daily ACH debit it would make from the Classes' business accounts was an "approximation" of the percentage of the merchant's receivables the Enterprise purportedly purchased, these "approximations" were fabrications. Rather, the Enterprise arbitrarily selected a fixed daily amount at the highest rate it believed it could squeeze from the Class merchant, resulting in loans of not only just 35% or 105% annual interest, but like with Sunrooms, as high as 875%. The sham of the Enterprise's selection of daily remittances is obvious from examining the big picture because the Enterprise would routinely select different "approximations" for the same merchant in short periods of loan refinances or even when two loans were entered into on the same day.

h. Finally, the MCA Agreements stated the Enterprise had full "recourse" to collect on the Agreement, thereby solidifying it as an absolutely repayable loan.

### THIS PURCHASE AGREEMENT IS AN AGREEMENT WITH RECOURSE.

137. Not only were the MCA Agreements usurious loans—as the Enterprise and Defendants understood as part of Defendants' funding thereof—they were also unconscionable, which only amplified how absolutely repayable these MCA Agreements were and how little risk the Enterprise was assuming in underwriting these loans disguised as MCA Agreements.

138. Among these unfair and oppressive provisions, the Enterprise included:

i. A Pennsylvania choice-of-law provision, which was designed to evade the criminal usury laws of Plaintiffs' home state and the Enterprise's home state of Florida, *see* Ex. 2 § 26;

ii. A Pennsylvania venue provision requiring the Plaintiffs and Class to litigate hundreds of miles away from their home state, *id.*;

iii. An unenforceable liquidated damages attorney's fee penalty awarding the Enterprise, and the Enterprise only such that even if the Class merchant was

-31-

vindicated, it would have no attorney's fee relief, 10% of the balance in the event a confession of judgment was filed against the Class, *id*. § 12;

iv.    A jury trial waiver, *id* § 30;

v.    A limitation of damages provision, *id.* § 18;

vi.    A personal guaranty by the owner of the Plaintiffs and Class merchant, *id*. at 17-18;

vii.    A provision giving the Enterprise the power of attorney over the Plaintiffs and Class merchants (thereby ensuring absolute repayment in the event of default), *id.* § 15;

viii.    A UCC lien on all of the Class merchant's assets (further ensuring absolute repayment), *id.* at 14;

ix.    A requirement to purchase business interruption insurance (further ensuring absolute repayment), *id* § 9(a);

x.    A provision prohibiting Plaintiffs and the Class from taking out other loans or financing with another party (forcing the Class into the vicious cycle of refinancing these usurious loans as was described in marketing materials to Defendants); and

xi.    A class action waiver (to prevent merchants like the Class here from pooling their resources together to fight organized crime), *id.* § 31.

139.    Consequently, the Enterprise and Defendants were entering into a scheme whereby the Defendants would fund the Enterprise's absolutely repayable loans that would have interest rates of at least 105% annualized, which was a knowing violation of numerous States' usury laws.

140.    In this way, Defendants' and the Enterprise's conduct is not unlike that of the attorney Scott Tucker ("Tucker"), who was indicted in 2016 for using payday loans with interest rates exceeding numerous State law's usury rates. *See* Indictment against Tucker, brought by the DOJ in the Southern District of New York, 16-cr-00091-PKC, attached hereto as **Exhibit 9**.

141.    Like Defendants and the Enterprise here through their sham use of a Pennsylvania choice of law provision, Tucker tried unsuccessfully to evade States' usury laws by entering into sham business relationships with certain Native American tribes and arguing—unsuccessfully— that his enterprise was therefore immune under the "tribal sovereign immunity" doctrine.

-32-

142.    Tucker was not the only usurious lender to try this tactic and fail. Charles Hallinan operated a similar usurious payday lending enterprise in the 1990s and 2000s.  He tried to shield himself from usury and other charges by setting up sham businesses in states like Delaware where there are no usury laws on business or personal loans—that failed too.  *See* Superseding Indictment, attached hereto as **Exhibit 10**, in *U.S. v. Hallinan, et al.*, 16-cr-130 (E.D. Pa.).

143.    As discussed below, the Enterprise—as Defendants knew—was operated out of Florida and only chose Pennsylvania as its purported principal place of business so it could insert PA choice of law and venue provisions in the sham MCA Agreements in an attempt to evade usury laws of Florida and many other States, including those where Plaintiffs reside.

**b.  *Wire Fraud***

144.    The Enterprise's fraudulent labeling of their MCA Agreements as purchases of receivables—which Defendants understood were usurious loans before investing—constitutes wire fraud as a RICO "racketeering activity" when the Enterprises MCA Agreements were sent to borrowers across the country with numerous fraudulent statements that the MCA Agreements were not loans but purchases of receivables.  *Fleetwood Servs., LLC v. Complete Bus. Sols. Grp.*, 374 F. Supp. 3d 361, 375 (E.D. Pa. 2019) (the "PA *CBSG* Action").

145.    Here, as demonstrated above, Defendants agreed to fund the Enterprise's MCA Agreements with full understanding that these were "loans" with annual interest in excess of 105%.

146.    As part of their diligence before funding the MCA Agreements, Defendants understood how the Enterprise intended to dupe borrowers like Plaintiffs and the Class into entering into these absolutely repayable loans by disguising them as purchases of receivables.

-33-

147.   Below is just a small sample of the many fraudulent terms in the Enterprise's MCA Agreements designed to conceal from the borrowers that they were entering into absolutely repayable loans:

    i.   That the MCA Agreement is enforceable when, in reality, it is nothing but an unenforceable usurious loan that is void *ab initio*;

    ii.   That the MCA Agreement was a purchase of the Plaintiffs' and Class merchants' future receivables;

    iii.   That the fixed daily payment under the MCA Agreements were based on an "approximation" of the Class merchant's receivables;

    iv.   That the MCA Agreement "is not intended to be, nor shall it be construed as, a loan";

    v.   That no portion of the amounts paid by the Plaintiffs and Class merchants "shall . . . be construed or considered to be interest"; and

    vi.   That the term of the MCA Agreement could change when, in reality, it was always fixed and never extended.

148.   Also recognized by the aforementioned decision in the PA *CBSG* Action, these fraudulent statements combined with the interstate ACH debits—as Defendants fully understood were part of the Enterprises scheme as the ACH program was described to them in verbal and written marketing materials—constituted wire fraud.  *Id.* at 376.

**C.   RICO Culpable Persons**

149.   Joseph LaForte ("LaForte"), his wife Lisa McElhone ("McElhone") and Joseph Cole Barleta ("Barleta") are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is an individual capable of holding a legal interest in property.

150.   By the time the Enterprise, defined below, was created in 2012, LaForte had racked up a series of convictions ranging from larceny, money laundering, and an illegal gambling business.  *See* Ex. 1 at 5.

151.     Consequently, while LaForte was the mastermind and ran the Enterprise, his wife McElhone was the "official" operator of CBSG and was one of the Enterprise members the Defendants would interact with before deciding to join the scheme.

152.     Indeed, McElhone listed herself as a "Director" and "Officer" of CBSG when she filed papers with the Florida Department of State, Division of Corporations, to have CBSG registered with Florida officials and represented that the Enterprise has a Florida business location at 2000 PGA Blvd, Suite 4440, Palm Beach Gardens, Florida, a copy of which is attached hereto as **Exhibit 11**.

153.     McElhone also listed herself as CBSG's "President" in filings with the State of California so that the Enterprise would collect unlawful debt from Class members in that state. *See* **Exhibit 12**.

154.     McElhone would sign affidavits in support of confessions of judgment at the direction of LaForte to collect unlawful debt through that mechanism as well.

155.     Barleta, as he testified to in the PA *CBSG* Action, served as CBSG's Chief Financial Officer, and was in charge of accounting, payroll, human resources, and IT.  *See* Barleta Dep. Tr., attached hereto as **Exhibit 13**, at 53:5-55:5.

156.     Together, Laforte, his wife McElhone, and Barleta were the masterminds and core leadership that constituted the Enterprise Defendants funded, as explained further below.

### D.  The CBSG RICO Enterprise

157.     LaForte, McElhone, Barleta (collectively, the "RICO Persons"), CBSG d/b/a Par Funding ("CBSG"), James LaForte, A Better Financial Plan, Renato (a/k/a Gino) Gioe ("Gioe"), and Dean Vagnozzi are an Enterprise (the "CBSG RICO Enterprise" or "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

-35-

158.     The CBSG RICO Enterprise is associated in fact through relationships of the RICO Persons and other members for the common purpose on an ongoing unlawful enterprise. Specifically, the Enterprise has the common goals: (i) of soliciting, funding, servicing and collecting upon usurious loans that charge annual interest rates well above the interest rates of more than a dozen jurisdictions, including Florida where the Enterprise operates out of; and (ii) committing wire fraud through knowingly using interstate electronic mailing of MCA Agreements containing materially fraudulent terms to conceal the fact that they are loans and then further utilizing interstate ACH debits to draw on these loans.

159.     Since at least 2012 through 2020—when CBSG's offices and LaForte's residences were raided by law enforcement—the members of the CBSG RICO Enterprise had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements or organized crime familial relations relating to the purpose of collecting unlawful debt from and committing wire fraud against small businesses and their owners through the United States.

160.     The CBSG RICO Enterprise consists of at least the following Entities: CBSG d/b/a Par Funding and Dean Vagnozzi's company A Better Financial Plan.

161.     The debt, including the debt evidenced by the MCA Agreements as Defendants knew before funding them—constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) and 18 U.S.C. § 1961 because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under more than a dozen States, including Florida where the Enterprise operates and States were the Plaintiffs reside.

162.     Since 2012 and continuing through 2020, the members of the CBSG RICO Enterprise have had ongoing relations with each other through common control/ownership, shared

personnel, one or more contracts or agreements and organized crime familial bonds to and for the purpose of committing wire fraud.

163.    As found by the PA *CBSG* Action, the CBSG RICO Enterprise's use of interstate electronic communications to negotiate and execute the MCA Agreements containing materially false terms and then collecting upon them using interstate ACH debits constitutes a pattern of wire fraud, a pattern repeated tens of thousands of times each time the Enterprise used interstate wires to enter into fraudulent MCA Agreements funded by Defendants with borrowers across the United States and thousands more times when the Enterprise performed daily interstate ACH debits from those borrowers' bank accounts.

164.    While the CBSG RICO Enterprise presented itself as a Delaware Limited Liability Company with a principal place of business in Philadelphia, PA, this was a sham designed to evade the usury laws of Florida where the Enterprise truly operates out of.

165.    As discussed above, McElhone stated in documents filed with the Florida State government that CBSG had a Florida office at 2000 PGA Blvd, Suite 4440, Palm Beach Gardens, FL 33408. Ex. 11 at 4.

166.    Therein, McElhone listed her address as 107 Quayside Drive, Jupiter, Florida 44377. *Id*. at 5.

167.    Barleta testified in his deposition in the PA *CBSG* Action that CBSG <u>does not</u> have an office in Philadelphia, but rather has a "Florida domicile." Ex. 13 at 49:20-50:4.

168.    When asked "tell me everyplace CBSG has an office?" Barletta responded with "Just Florida," where McElhone works as CBSG's "President." *Id.* at 172:5-21.

169.    Barleta was also deposed in another civil lawsuit filed against CBSG entitled *HMC Incorporated, et al. v. Complete Business Solutions Group Inc. et al.*, 19-cv-3285 (E.D. Pa.), a

copy of his transcript is attached hereto as **Exhibit 14**, in which he testified that (1) CBSG has an office in and based out of Florida multiple times and pays no city taxes in Philadelphia; (2) that McElhone, a Florida resident, worked out of CBSG's Florida office; (3) that CBSG's only physical location was in Florida; (4) that Barleta would have daily conversations about the Enterprise business with McElhone while she was in Florida by phone and email; (5) that McElhone made decisions for CBSG from Florida.  *See* Ex. 14 at 149:4-159:12, 218:23-222:5 & 270:14-24.

170.    Barleta also testified in the *HMC* action that LaForte is the "director of sales at Par Funding."  *Id.* 321:2-18

171.    Similarly, when LaForte was deposed in the PA *CBSG* Action, he too testified that "CBSG is located in Florida" and does not have an office in Philadelphia.  *See* LaForte Dep. Tr., dated December 5, 2019 in the PA *CBSG* Action, attached hereto as **Exhibit 15**, at 56:11-16.

172.    LaForte reiterated once more in his testimony that "Par Funding is a Florida Company."  *Id.* at 60:8-9.  He further testified that his wife McElhone works often out of CBSG's office in Florida.  *Id.* 62:10-63:14.

173.    Industry press releases by the Enterprise, such as the example attached hereto as **Exhibit 16**, further confessed that CBSG d/b/a Par Funding was a Miami-based business.

174.    Moreover, the SEC Action was brought in Florida because of the Enterprise's connections there.  *See* SEC Action Amended Complaint, attached hereto as **Exhibit 17**, ¶ 11 ("Par Funding is a Delaware company Lisa McElhone and her husband, Joseph LaForte, started in 2011 . . . and current has its sole office in Palm Beach Gardens, Florida").

175.    Thus, the CBSG RICO Enterprise is Florida based, and only fraudulently presented itself as having a Pennsylvania office to circumvent Florida's and other State's usury laws.

E. **The Roles of the RICO Persons in Operating the Enterprise and the Roles of Individual Enterprise Members**

176.     The RICO Persons have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a common structure to operate as a unit in order to accomplish the common goals of collecting unlawful debt and wire fraud as follows:

i.     **The RICO Persons: LaForte, McElhone & Barleta**

177.     RICO Persons LaForte, McElhone and Barleta are the principals of the Enterprise.

178.     Together, they are responsible for the day-to-day operations of the Enterprise and have the final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which Defendants will fund each loan and ultimate payment terms, and the amount and repayment term for each usurious loan.

179.     In their capacity as principals, LaForte, McElhone and Barleta are responsible for creating, approving and implementing policies, practices and instrumentalities used by the Enterprise to accomplish its common goals of collecting unlawful debt and wire fraud, including: (i) the form MCA Agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of unlawful debt; (ii) the method of collecting the daily payments via interstate ACH withdrawals, which was conveyed to Defendants; (iii) the methods used, such as confessions of judgment signed by McElhone or violence threats by other members, used by the Enterprise; and (iv) the methods used by the Enterprise to entice Defendants joining the Enterprise's common goals of collecting of unlawful debt and wire fraud by convincing Defendants to fund the MCA Agreements.

-39-

180.    LaForte, McElhone, and Barleta took actions and directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise, including directing the affairs of the Enterprise, directing members to solicit Defendants to provide the funds for the usurious loans, funding the Enterprise, directing members of the Enterprise to collect upon unlawful loans and send fraudulent MCA Agreements to borrowers across the United States using interstate wires, executing legal documents—in some instances forged confessions of judgment—to support the Enterprise, and directing other members of the Enterprise to threaten or inflict bodily harm on borrowers and other individuals to collect on the unlawful debt.

181.    LaForte, McElhone, and Barleta have benefitted from the Enterprise's common goals of collecting unlawful debt and wire fraud by funneling the ill-gotten gains therefrom to themselves, other Enterprise members, and co-conspirators like Defendants.

### ii.    CBSG d/b/a Par Funding – The Enterprise's MCA Entity

182.    CBSG d/b/a Par Funding maintains offices, books, records, and bank accounts independent from the other Enterprise members.

183.    The RICO Persons have operated CBSG as part of an unlawful Enterprise to collect upon unlawful debt and commit wire fraud.  Pursuant to its membership in the Enterprise, CBSG has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans disguised as agreements to purchase receivables; (ii) entered into participation agreements with investors, including Defendants, for the explicit purpose of funding the usurious loans; (iii) pooled the funds of investors, such as Defendants, to fund each usurious loan; (iv) underwrote the usurious loans and determined the ultimate rate of usurious interest to be charged under each loan; (v) entered into the so-called MCA Agreements on behalf of the Enterprise; (vi) serviced the usurious loans; (vii) set-up and implemented the ACH interstate withdrawals used by the Enterprise to

collect upon the unlawful debt; (viii) used interstate wires to negotiate the economic terms and send MCA Agreements to borrowers across the United States for their execution; and (ix) obtained judgments, always fraudulent and sometimes forged, in its name to further collect upon the unlawful debt.

184.    In this case, CBSG, through the RICO Persons: (i) solicited borrowers such as Plaintiffs and the Class at large using interstate wires; (ii) pooled funds from investors like Defendants to fund the usurious loans; (iii) underwrote the usurious loans; (iv) entered into the usurious loans; (v) sent the usurious loans using interstate wires to borrowers such as Plaintiffs and the Class in which the usurious loans were fraudulently represented to be agreements to purchase receivables; and (vi) collect upon the unlawful debt evidenced by the MCA Agreements by effecting interstate wire transfers from the bank accounts of Plaintiffs and the Class.

185.    As the SEC has alleged, LaForte operates CBSG as the "*de facto* CEO[.]"  Ex. 15 ¶ 43.  The SEC has further alleged that CBSG has "funded more than $600 million in Loans", some of which "carry interest rates of more than 400% and "more than half of the Loans charge in excess of 95% interest," which is entirely consistent with what Defendants were told about the Enterprise's loans prior to agreeing to fund the MCA Agreements.  *Id.*  ¶¶ 43-46.

### iii.    Dean Vagnozzi & Better Financial Plan – The Enterprise's Marketing Arm That Solicited Funds from Defendants

186.    As set forth in the SEC's Amended Complaint in the SEC Action, Dean Vagnozzi, through his company Better Financial Plan, furthers the Enterprise's goals by recruiting individuals to create "Agent Funds," i.e., the SPV Defendants, to solicit Defendants to fund the usurious loans disguised as MCA Agreements.  Ex 17 ¶ 6.

187. Dean Vagnozzi holds himself out as the "President & CEO of A Better Financial Plan" in videos the Enterprise creates to entice investors, like Defendants, to fund the Enterprise's usurious loans.

188. Dean Vagnozzi, like his family members Defendants Alec and Albert Vagnozzi, also created their own SPVs to fund the Enterprise's usurious loans. Specifically, Dean Vagnozzi created the non-Defendant company ABFP Management Company, LLC to fund the Enterprise's MCA Agreements. *Id.* Alec and Albert Vagnozzi created the SPV Defendants Pisces, Pisces Parallel, Capricorn, Capricorn Parallel, MSI, and MSI Parallel which alone, a fraction of the total Defendants, raised more than $500 million for the Enterprise. *See* Ex. 5.

189. According to the SEC, Dean "Vagnozzi and his company [Better Financial Plan] raised about $20 million for Par Funding in exchange for a commission equal to 6 or 7 percent of each investment he solicited." Ex. 17 ¶ 57.

190. As reflected in the slides reproduced above and Exhibit 6 attached hereto, Dean Vagnozzi, operating through Better Financial Plan, solicited Defendants to provide the funds for the Enterprise's MCA Agreements. *Id.* ¶ 22.

191. To quote the SEC: "Since January 2019, [Dean Vagnozzi] also recruited individuals to start investment firms to raise money for Par Funding[.]" *Id.*

192. The SEC has further stated that Better Financial Plan "has been soliciting investors for Par Funding [i.e., CBSG] since no later than April 4, 2017." *Id.* ¶ 26. The SEC also stated that Dean "Vagnozzi is instrumental in recruiting people [including Defendants] to start Agent Funds to provide funding to Par Funding." *Id.* ¶ 71.

193. Just like the slides and presentation described above, the SEC stated that Dean Vagnozzi solicited investors like Defendants and "goes on to talk about Par Funding, describing it

as one of the best MCA lenders you can find, touts the 1% default rate, and says you can get commissions and 'you will make money.'" *Id*. ¶ 72.

194.     The above slides and presentation by Dean Vagnozzi and Better Financial Plan are just some of numerous such materials presented to Defendants that convinced them to fund the Enterprise's usurious loans.

195.     In another similar video marketing material for the Enterprise, Dean Vagnozzi and Better Financial Plan explained to Defendants that "merchant cash advance **lenders** provide growth opportunity **loans** to small businesses."

196.     Dean Vagnozzi and Better Financial Plan made it clear to Defendants that they would be investing in "**loans**," a word repeated frequently in their marketing materials and stated even more clearly in slides Defendants viewed before joining the Enterprise's scheme, the one below taken from another Enterprise marketing video:



197.     Dean Vagnozzi and Better Financial Plan made it clear to investors like Defendants that the Enterprise would be collecting from "**Borrowers**" using interstate "Automatic Daily ACH Deposits," per the slide below from another presentation:



198.    In this other promotional video, attached hereto as **Exhibit 18**, Dean Vagnozzi and Better Financial Plan state, while the below slide was shown to Defendants, that "since the merchant cash advance industry **lends** money so quickly, again usually within 48 hours, they typically charge the **borrower** an **interest rate** *of at least* **35 percent**."



199.    In this second marketing video presented to Defendants, Dean Vagnozzi and Better Financial Plan reiterated that these loans had repayment terms of less than 100 days, and would be re-extended at least three times in one year to a given borrower, thereby putting Defendants on notice that the annual interest rates for these MCA Agreements the Enterprise was asking Defendants to fund would be loans with least **105%** interest, per the below slide.  *See* Ex. 18.

-44-



200.    Because of Dean Vagnozzi and Better Financial Plan's efforts to recruit and convince investors like Defendants to join the Enterprise's scheme, the SEC estimates that "there are more than 40 Agent Funds raising investor money for Par Funding."  Ex. 17 ¶ 78.

### iv.    Gino Gioe & James LaForte—The Enterprise's Collection Enforcers with Ties to Organized Crime

201.    As set forth above, James LaForte is the brother of the Enterprise's mastermind and *de facto* CEO of CBSG Joseph LaForte.

202.    In a November 8, 2023 letter by the DOJ to a Federal Judge for the Eastern District of New York, attached hereto as **Exhibit 19**, James (or "Jimmy") LaForte is a made member of an organized crime family who "kicked up" more than $1.5 million in proceeds from the Enterprise's usurious lending to the captain of an organized crime family.  Ex. 19 at 4.

203.    In a November 2, 2023 indictment filed by the DOJ in the Eastern District of New York, attached hereto as **Exhibit 20**, James LaForte has been accused by the DOJ as being a member of a separate criminal enterprise with direct ties to organized crime whose racketeering activities included "loansharking."  Ex. 20 ¶ 9.

204.    The DOJ accused James LaForte and his associates in the organized crime family of the following criminal acts: "acts of violence, including murder and assault."  *Id*. ¶ 10.  Not

-45-

unlike when James LaForte assaulted the receiver in the SEC Action in February 2023 on his brother LaForte's orders.

205.    In a separate indictment filed against LaForte, McElhone, Barleta, CBSG and James LaForte by the DOJ in the Eastern District of Pennsylvania on May 18, 2023, *see* Exhibit 2, the DOJ explained how James LaForte would contact borrowers on MCA Agreements and pressure them into making payments so that the Enterprise could continue to tout its purported 1% default rate.  Ex. 2 ¶ 23 (OVERT ACTS).

206.    The DOJ further alleges that "JAMES LAFORTE performed work for defendant JOSEPH LAFORTE at defendant PAR FUNDING in a variety of roles . . . including **express and implied threats of violence, to collect payments from defendant PAR FUNDING's customers**."  Ex. 2 ¶ 3 (Count 22) (emphasis added).

207.    This DOJ indictment also described how Enterprise member Renato (a/k/a Gino) Gioe ("Gioe") served as a separate enforcer for the Enterprise and that Gioe "at defendant JOSEPH LAFORTE's direction, contacted delinquent borrowers via phone calls, texts messages, and personal visits to their homes and businesses to make express and implied threats of violence to the merchant-customers and their families, such as threats to stick a fork in a merchant-customer's head or cut off the merchant-customer's hands."  *Id*. ¶ 6.

208.    The DOJ alleged that Joseph LaForte and James LaForte "knowingly conspired and agreed with Renato Gioe and others . . . to participate in the use of extortionate means . . . to collect and attempt to collect extensions of credit from multiple merchant-customers" the DOJ identifies as "Extortion Victim[s]."  *Id*. ¶ 15.

209.    The DOJ further alleged that "Defendant JOSEPH LAFORTE directed Renato Gioe and defendant JAMES LAFORTE to travel throughout the United States to make

-46-

unannounced personal visits to the businesses and homes of representatives of the merchant-customers, in order to make hostile, threatening, and intimidating communications to these representatives." *Id.* ¶ 17.

210.    Plaintiffs were victimized by James LaForte's and Gioe's violent and intimidating collection efforts made at the direction of Joseph LaForte and the Enterprise.

211.    For instance, on or about February 15, 2018, Gioe was sent and appeared at the offices of Plaintiff Radiant where he threatened the life of Radiant's owner, Plaintiff Wolfe, and the owner's families' lives if immediate payment was not made to the Enterprise.  Gioe can been seen entering Radiant's offices from security camera images reproduced below:



212.    Gioe's enforcement exploits for the Enterprise have even been reported in the media, such as in a Bloomberg News article attached hereto as **Exhibit 21**.

213.    Gioe's collection efforts for the Enterprise were also the subject of a Criminal Information filed by the DOJ with the Eastern District of Pennsylvania, attached hereto as **Exhibit 22**, on August 26, 2022.

214.     Therein, the DOJ alleged that "Defendant RENATO GIOE worked for the collections department for Complete Business Solutions Group, Inc., doing business as Par Funding . . . .[and] acted as an 'enforcer' and used extortionate means, including express and implied threats of violence, to collect payments from its customers."  Ex. 22 ¶ 1.

215.     The Criminal Information against Gioe further stated that "[a]fter defendant RENATO GIOE visited these representatives of the merchant-customers, Par Funding . . . continued to collect funds from the merchant-customers and continued to make hostile, threatening, and intimidating electronic and telephonic communications as necessary to collect on delinquent credit." *Id.* ¶ 16.

**F.   Unlicensed Brokers, SPV & Chehebar Defendants' Roles as the Enterprise's Co-Conspirators & Funders**

216.     As set forth by the United States Supreme Court below, co-conspirators need not participate in every substantive offense; all that is needed for liability is an agreed upon plan to provide support to the Enterprise:

> The RICO conspiracy statute, simple in formulation, provides: 'it shall be unlawful for any person to conspire to violate any provisions of subsection (a), (b), or (c) of this section.' 18 U.S.C. § 1962(d). . . A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. See *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 253-254, 84 L. Ed. 1129, 60 S. Ct. 811 (1940). The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the  acts of each other. See *Pinkerton v. United States,* 328 U.S. 640, 646, 90 L. Ed. 1489, 66 S. Ct. 1180 (1946) ("And so long as the partnership in crime continues, the partners act for each other in carrying it forward"). If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators. As Justice Holmes observed: "Plainly a person may conspire for the commission of a crime by a third person." *United States v. Holte*, 236 U.S. 140, 144, 59 L. Ed. 504, 35 S. Ct. 271 (1915). A person, moreover, may be liable for conspiracy even though he was incapable of committing

-48-

the substantive offense. *United States v. Rabinowich*, 238 U.S. 78, 86, 59 L. Ed. 1211, 35 S. Ct. 682 (1915).

*Salinas v. United States*, 522 U.S. 52, 63(1997)

217.    As set forth above, the Defendants all knowingly conspired in the Enterprise's unlawful activities of collecting unlawful usurious debt and wire fraud based on information the Enterprise conveyed to them before Defendants agreed to provide the Enterprise with the funds for their MCA Agreements.

218.    As referenced above, the Unlicensed Broker Defendants were instrumental in raising funds for the Enterprise that went towards funding $227,232,019 worth of MCA Agreements in 2019 alone.  Ex. 4.  For this, the Unlicensed Broker Defendants—according to CBSG's SEC filings at least—earned $3,600,000 in "Finder's Fees."  *Id.*

219.    The SPV Defendants also raised hundreds of millions of dollars to fund the Enterprise's MCA Agreements.  Indeed, just a handful of the SPV Defendants—Pisces, Pisces Parallel, Capricorn, Capricorn Parallel, Merchant Services, and Merchant Parallel—alone "raised more than $500 million from investors nationwide through a network of so-called 'Agent Fund Managers' who operated their own securities offerings in an orchestrated effort to funnel investor money to CBSG in exchange for CBSG promissory notes."  Ex. 5 ¶ 1.

220.    The May 18, 2023 indictment against LaForte, CBSG, Barleta, James Laforte, and McElhone also reiterated that these defendants in that indictment raised $550 million from investors, i.e., many of the instant SPV Defendants. Ex. 19 ¶ 14 (Count One).

221.    Defendant Dean Vagnozzi, through his company Better Financial Plan, raised $20 million for the Enterprise on his own, as alleged by the SEC.  Ex. 15 ¶ 57.

222.    The Chehebar Defendants, along with Defendant Lindsay Inc., also raised money for the Enterprise through explicit consulting agreements, collectively attached hereto as **Exhibit**

-49-

**23**, in which the scope of services the Chehebar Defendants and Defendant Lindsay Inc. was defined as "assist[ing] [CBSG] in establishing contact with potential Investors." Ex. 23 at 1, 10 & 20 (consulting agreement with Lindsay Inc. involving the services of "locating sources of funding for [CBSG]").

223.     LaForte does not deny that the Chehebar Defendants and Lindsay Inc. worked with CBSG to find funders for the Enterprise. In fact, in a filing by LaForte in the SEC Action, attached hereto as **Exhibit 24**, LaForte stated that "the Chehebars received a profit percentage" for their services in finding funders, like Defendants, for the Enterprise and that the Chehebar Defendants "are wealthy, sophisticated business people who dealt directly with Par principals and conducted extensive due diligence on Par prior to executing their consulting agreements[.]" Ex. 24 at 17-18.

224.     Thus, all Defendants understood—either through relying on the Enterprise's marketing materials before funding the Enterprise's usurious loans that made the scheme explicit and/or through their own due diligence—that by funding the Enterprise's MCA Agreements, the Defendants would be furthering the Enterprise's common goals of collecting unlawful debt and committing wire fraud.

225.     Thus, Defendants had full knowledge that they would be funding usurious loans of individual interest rates of at least 35% for loans repayable within 100 days and upwards of 105% annual interest on MCA Agreements for individual borrowers when these < 100-day loans were re-extended at least three times in a given year to a single MCA Agreement borrower.

226.     Defendants also had full knowledge through their due diligence before agreeing to the Enterprise's goal of collecting unlawful debt that these "MCA Agreements" that were repeatedly expressed verbally and in written materials to Defendants by the Enterprise's marketing member as "loans" would be sent to borrowers across the United States using interstate wires and

drawn using interstate ACH debits were fraudulently disguised as purchases of the borrower's future receivables, an act that the PA *CBSG* Action has already ruled to constitute wire fraud.

227.   With full knowledge of this scheme and the twin goals of the Enterprise, Defendants knowingly conspired to participate in and advance the interests of the Enterprise by raising at least $550 million in funding for the Enterprise, which Defendants were handsomely rewarded for.

228.   Consequently, the Defendants were knowing and material co-conspirators in the Enterprise's dual aims of collecting unlawful debt and trying to conceal that unlawful activity through wire fraud by misrepresenting the MCA Agreements Defendants funded as purchases of receivables, even though all Defendants knew they were funding loans with interest rates of at least 35% and as much as more than 105% on an annual basis.

### G.  Defendants Eckert and Pauciulo Helped Fund the Enterprise

229.   The Enterprise did not just include organized crime family members like Joseph LaForte and Gioe nor did it simply include unscrupulous marketers like Defendant Dean Vagnozzi and his company Better Financial Plan that convinced Defendants to fund what was explicitly described as loans with interest rates of at least 35% and at least 105% total annual interest.

230.    The Enterprise even convinced the law firm Eckert Seamans Cherin & Mellott ("Eckert") and Eckert's former partner John Pauciulo, *Esq.* ("Pauciulo," and collectively the "Eckert Defendants") to serve as another wing of the Enterprise's marketing team in soliciting investors like Defendants.

231.   Like Defendant Dean Vagnozzi and his company Better Financial Plan, the Eckert Defendants prepared video marketing materials for the Enterprise encouraging investors (like the

other Defendants) to join in on funding the usurious loans, as reflected by the marketing video Pauciulo created for the Enterprise, attached hereto as **Exhibit 25**.

232.    In the video, Pauciulo proudly states that "together Dean [Vagnozzi] and I have created a model where a retail investor can get involved in a kind of . . . alternative asset classes."

233.    Pauciulo then presents a slide to Defendants asking:

**What's Unique About A Better Financial Plan?**

234.    Pauciulo further touts the due diligence he has conducted into the products, i.e., the MCA Agreements, offered by Dean Vagnozzi and Better Financial Plan, and that he would provide investors like Defendants with all the necessary disclosures for investments that are "exemptions" from the SEC's registration requirements, i.e., the MCA Agreements.

235.    As a result of his role in the Enterprise, on July 7, 2022, the SEC brought an order instituting public administrative and cease-and-desist proceedings against Pauciulo, which Pauciulo consented to. *See* Ex. 3 at 2 ("Respondent consents to the entry of this Order Instituting Public Administrative Cease-and-Desist Proceedings").

236.    Therein, the SEC stated that "[t]hese proceedings arise out of attorney Pauciulo's role in a multi-million-dollar unregistered offering fraud through his involvement with the unregistered and fraudulent offerings of multiple private investment funds created [i.e., Defendants] to invest in Complete Business Solutions Group, d/b/a Par Funding." Ex. 26 ¶ 1.

237.    The SEC further stated that "Pauciulo provided legal representation for one of the sales agents, [Dean] Vagnozzi, who raised more than $100 million from investors for investments into CBSG through at least seven private investment funds . . . and Pauciulo also provided legal representation for at least 25 other private investment funds formed to raise money for CBSG . . . The Agent Funds [such as Defendants] raised money from investors to be invested in CBSG's merchant cash advance business[.]" *Id.* ¶¶ 7-8.

238.    The SEC cease and desist proceedings detailed how Pauciulo and Dean Vagnozzi worked together in attending dinner seminars and radio advertising to entice people to invest in the SPV Defendants so that they may provide funding for the Enterprise. *Id.* ¶¶ 11-13.

239.    Pauciulo wasted no time settling the charges raised by the SEC—reaching settlement the same day the SEC's cease and desist order was entered.  *See* Press Release, Securities and Exchange Commission, SEC Charges Philadelphia Lawyer with Fraud (July 7, 2022), *available at* https://www.sec.gov/enforce/33-11080-s.

**H.  The Receiver in the SEC Action Has Barred & Tolled Plaintiffs' Claims Against the Enterprise, Necessitating This Suit Against The Enterprise's Co-Conspirators.**

240.    On July 24, 2020, the SEC filed a case against CBSG, LaForte, Dean Vagnozzi, McElhone, Cole and additional non-Defendants corporate investors in CBSG in the SEC Action. That same day, the SEC also moved for a receiver to be appointed over the Receivership Estate, as defined above.

241.    On July 27, 2020, the SEC Action appointed the Receiver to "take any other action as necessary and appropriate for the reservation of the Receivership Entities' property interest or to prevent the dissipation or concealment of such property interest."  *See* SEC Action [DE 36].

242.    On or about August 13, 2020, the Court in the SEC Action granted a litigation stay against the "Receivership Entities," which included CBSG, thereby prohibiting Plaintiffs and the

-53-

Class from continuing to pursue their active litigations or bringing new litigations against the Enterprise for damages relating to the unlawful collection of debt and wire fraud (the "Stay Order"). *See* a copy of the Stay Order, attached hereto as **Exhibit 26, ¶¶** 32-34.

243. The Stay Order, however, did not extend to the instant Defendants. Indeed, the SEC Action's receiver claim form explicitly lists entities that are and are not covered by the Stay Order, and none of the Defendants herein are subject to that Order, as made plain by the Receiver's claim form, attached hereto as **Exhibit 27**..

244. During the course of the SEC Action, the SEC receiver has been helping to collect funds to repay the Enterprise investors that are covered by the SEC Receivership, while Defendants have been actively participating and seeking recovery as well. Indeed, during a November 29, 2023 status conference in the SEC Action, the transcript of which is attached hereto as **Exhibit 28**, numerous Defendants and/or their agents attended the conference as part of their continuing efforts to obtain the Enterprise's assets at the expense of Plaintiffs and the Class who were the true victims of the Enterprise's conduct.

245. Several Defendants, such as AGM and AGM II, have been opposing the SEC Receiver's efforts to obtain information about their participation in funding the Enterprise. *See* AGM's and AGM II's objections to the subpoena served by the SEC Receiver filed in the SEC Action at [DE 294] and [DE 295].

246. Thus, Defendants and other investors who knowingly conspired with the Enterprise's common goals of collecting unlawful debt have abused procedure in the SEC Action such that they—and not the true Enterprise victims such as Plaintiffs and the Class—will receive proceeds from the Enterprise's estate, which includes the unlawful debt collected by the Enterprise.

-54-

247.     The SEC Receiver has done nothing to help the true victims of the Enterprise and Defendants' scheme.  Quite the opposite, in fact, as demonstrated by the SEC Receiver's motion to dismiss the claims certain merchants had filed against CBSG in the Eastern District of Pennsylvania for RICO violations on December 7, 2023, attached hereto as **Exhibit 29**.

248.     The SEC Receiver filed this motion *after* denying Fleetwood, Mr. Fleetwood, and Mrs. Fleetwood's mandatory claim submission to the SEC Receiver in the SEC action.

249.     To date, the SEC Receiver has ***denied every single mandatory claim filed by an Enterprise borrower***.  Thus, no Plaintiff nor the Class Members has any hope of justice through the SEC Action given the SEC Receiver's untenable bias against the true victims of the Enterprise.

250.     Instead, the SEC Receiver is presiding over the fruits of CBSG's unlawful collection of debt and preparing distributions thereof to the very investors in the Enterprise who knew they were investing in usurious loans that would victimize borrowers like the Plaintiffs and the Class.

251.     The SEC Receiver has knowingly stepped into the shoes of CBSG and is presently collecting on the indisputably unlawful debt by **continuing to debit victim merchant's accounts pursuant to the MCA Agreements Defendants funded that those merchants entered into with CBSG in order to gain more funds for the purpose of paying himself and investors like Defendants who conspired with CBSG to fund these usurious loans.**

252.     Specifically, the Receiver has retained the very same CBSG collection officers to intimidate and harass victim merchants, and these CBSG collection officers the Receiver has retained go on to misrepresent to these victim merchants that they are "U.S. Government" officials and threaten to "freez[e] all new or old bank accounts, paypal, cash app, venmo's, credit card processor's ect again as that was done prior with your clients to obtain payments and get your

-55-

attention to resolve." *See* December 18, 2020 email sent by "Aubrey Brown" of Par Funding at the Receiver's request to a victim merchant, attached hereto as **Exhibit 30**.

253. Thus, rather than work with merchant victims "in good faith," as the SEC Action required the Receiver to do, *see* SEC Action Claims Administration Order, attached hereto as **Exhibit 31**, at ¶ 14, the Receiver is employing the very same CBSG agents to continue harassing victim merchants into making payments to the Receiver.

254. The SEC Receiver does so in defiance of the SEC's own allegations that the MCA Agreements the SEC Receiver is collecting upon—just as CBSG did—are "loans – some of which charge more than 400% interest[.]" Ex. 17, ¶ 1.

## I. **The Enterprise's Use of Interstate Commerce to Implement Its Schemes**

255. The Enterprise engaged in interstate commerce and used instrumentalities of interstate commerce in its daily business activities.

256. Specifically, members of the Enterprise maintained an office in Florida and used personnel in that office to originate, underwrite, fund, service and collect upon the usurious loans funded by Defendants and made by the Enterprise to small business owners across the United States—including numerous states prohibiting this exact sort of usurious lending—via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

257. In the present case, all communications between the RICO Persons and other Enterprise members, CBSG, and Better Financial Plan were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the MCA Agreements, fund the advances under each of the MCA Agreements using money from Defendants, and collect

the payments via interstate electronic ACH debits, as Defendants were told explicitly before investing in the Enterprise.

258.    The Enterprise also used interstate wire communications to direct the Enterprise's enforces, such as James LaForte and Gioe, to travel to borrowers' businesses and home residences to threaten and intimidate borrowers into making payments on the usurious MCA Agreement loans that Defendants funded in full knowledge of this illegal scheme.

259.    In addition, at the direction of the RICO Persons, each of the MCA Agreements was executed in and outside of Florida, and original copies of the MCA Agreements were sent from the states of Plaintiffs and the Class to the Enterprise, through the Enterprise, at its office in Florida via electronic email.

### J.    Injury and Causation

260.    As set forth in detail below, Plaintiffs and the Class have been injured. They will continue to be injured in their business and property by reason of the Enterprise's and Defendants' violations of 18 U.S.C. § 1962 in an amount to be determined at trial.

261.    The injuries to Plaintiffs and the Class directly, proximately and reasonably foreseeably resulting from or caused by the Enterprise's and Defendants violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of millions of dollars in improperly collected criminally usurious loan payments.  Plaintiffs and the Class were forced to make daily payments pursuant to the MCA Agreements that amounted to unconscionable interest rates—which Defendants fully understood before agreeing to fund the Enterprise's MCA Agreements.

262.    As the SEC noted in its Amended Complaint in the SEC Action, "Par Funding has purportedly funded more than $600 million in Loans.  Some of Par Funding's Loans carry interest rates of more than 400%."  Ex. 15, ¶¶ 44-45.

-57-

263.     Consequently, Plaintiffs and the Class have been damaged by the Enterprise's and Defendants' violations of the RICO statute in the magnitude of several hundred million dollars, if not over a billion dollars, and that is only counting the economic harm, not the physical and psychological harm wrought by the Enterprise's enforces like James LaForte and Gioe.

264.     Plaintiffs and the Class have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting the Enterprise's criminal activities and seeking to overturn fraudulent confessions of judgment filed against Plaintiffs and the Class, several of which were forged.

265.     Pursuant to 18 U.S.C. § 1964, Plaintiffs and the Class are entitled to treble damages, plus costs and attorneys' fees from Defendants who knowingly conspired with the Enterprise by funding the MCA Agreements that inflicted the 9 to 10-figure damages on Plaintiffs and the Class at large.

### HOW PLAINTIFFS AND THE CLASS WERE VICTIMIZED BY THE ENTERPRISE AND DEFENDANTS

**A.     Plaintiffs Sunrooms & Foti – New Jersey Victims**

266.     Sunrooms America, Inc. ("Sunrooms") is a second-generation, family-owned designer and installer of sunrooms, patio covers, pergolas, and screen rooms.  It is a New Jersey corporation with its principal place of business  in Williamstown, New Jersey.

267.     Sunrooms is owned and operated by Michael V. Foti ("Foti"), a New Jersey resident.

268.     Between June 5, 2019, and January 2, 2020, Sunrooms—with Foti providing a guaranty that provided personal recourse against him should Sunrooms declare bankruptcy— entered into a series of seventeen (17) criminally usurious loans (funded in large part by Defendants) that were fraudulently represented to be the purchase of Sunrooms' future receivables.

269.     Each Sunrooms MCA Agreement contained the same common terms and conditions, and each charged an interest rate in excess of 100%, thereby violating both New Jersey and Florida's applicable usury laws.

270.     Like the Enterprise's and Defendants' other victims, the unlawful and unconscionable interest payments pushed Sunrooms into financial catastrophe by causing it to take out more and more unlawful loans with the Enterprise that were funded in large part by Defendants.

271.     As a direct result of these unlawful and unconscionable usurious loans, Sunrooms could no longer sustain the fixed daily payments under the usurious loans and stay in business.

272.     Thus, on or about January 10, 2020, Sunrooms stopped making payments.

273.     Immediately upon missing a single payment, Sunrooms' owner Foti was besieged by phone calls, emails and text messages demanding payment from the Enterprise.

274.     On January 15, 2020, the Enterprise confessed judgment against both Sunrooms and Foti personally for $1,361,845.70.  In doing so, the Enterprise fraudulently confessed judgment against Foti under the June 4, 2019 Sunrooms MCA Agreement for $259,791.06.

275.     Under that MCA Agreement, the Enterprise knew that Foti had only guaranteed performance of the representations and warranties thereunder.  To be sure, the Enterprise tweaked the form of its MCA Agreements funded by Defendants in or around July 2019 to require guarantors like Foti to also guarantee all terms, obligations and covenants, which was non-existent in the June 4, 2019 Sunrooms MCA Agreement.

276.     That same day, January 15, 2020, the Enterprise also sent hundreds of emails to clients, vendors, business contacts and personal contacts of Foti, claiming that Sunrooms was in default and owed CBSG $1,296,173.93.  CBSG also claimed to possess a UCC-1 form, requiring the recipient to forward payments of $1,296,173.93 directly to CBSG.  Conspicuously missing,

-59-

however, was the UCC-1 form.  That is because CBSG did not file the UCC until January 16, 2020, and it was not entered until January 22, 2020.  CBSG thus also engaged in numerous counts of mail fraud in addition to the collection of unlawful debt and wire fraud that Defendants materially assisted by funding MCA Agreements, including those entered into by Sunrooms.

277.    In addition to sending default notices to business entities that did not own Sunrooms' receivables, the Enterprise also sent out default notices to Foti's friends and family, including his college-age niece.

278.    These notices were sent to harass, intimidate and extort Sunrooms and Foti into making payment from any source available, even if they had to borrow money.

279.    On January 15, 2020, a guy by the name of Anthony also called Foti berating him for missing payments.  He then gave the phone to LaForte, who yelled and screamed at Foti.

280.    Among the verbal attacks, LaForte told Foti that he was a "fucking piece of shit" and warned Foti that he would destroy his business and pursue him personally until the day he died.  LaForte also stated he hoped Foti would get hit by a car.  He threatened to open up a competing sunroom company to put Sunrooms and Foti out of business.

281.    On January 16, 2020, without providing the required notice under Pennsylvania law, CBSG had a sheriff serve a Writ of Execution on numerous banks located in Pennsylvania that Sunrooms and/or Foti used.  As a direct result, the Wells Fargo bank accounts of Foti and his wife were unlawfully frozen.  CBSG also unlawfully froze the bank account of Sunrooms with Franklin Savings Bank.

282.    On January 17, 2020, LaForte called Foti again to verbally abuse him.  Among other extortionate tactics, LaForte threatened to "blow the doors" off both Foti and his counsel.

-60-

Given the tone and rage in which LaForte made this threat, Foti took this as a physical threat and was in fear for the health and safety of himself and his family.

283.    The Enterprise was informed that it had unlawfully frozen the bank account of Foti's wife, a fourth grade school teacher.  To this day, the Enterprise refuses to release her bank account.

**B.      Haagen Dazs, ASB & Shah – New Jersey Victims**

284.    Haagen Dazs were two ice cream franchises run and owned by Plaintiff Shah, through RKDK and Hudson, based in New Jersey.

285.    ASB is a family-owned company providing consumers with access to news focused on South East Asia, also based in New Jersey, of which Shah was a minority owner during the relevant time frame.

286.    During a period of dire financial health, in or around 2014, the Haagen Dazs franchise owned by Shah reached out to alternative lenders and ultimately chose CBSG to help obtain financing for the struggling franchise after Shah spoke with LaForte who gave the fake name as Joe Mack.

287.    Haagen Dazs through either RKDK or Gelato, with Shah serving as the required guarantor, entered into its first MCA Agreement with CBSG in 2014, which was fully or at least partially funded by Defendants.

288.    And that started the negative-feedback loop of spiraling usurious debt for Haagen Dazs and its owner Shah, as CBSG used its well-tuned tactics to force a merchant to refinance or enter into new MCA Agreements in order to pay off the prior usurious loans, all of which were funded in part or in whole by Defendants.

289.     Specifically, between 2014 and 2017, the Haagen Dazs franchise owned by Shah entered into more than a dozen MCA Agreements with CBSG, most of which were refinances of prior MCA Agreements that increased the usurious interest rate and some of these MCA Agreements only provided for interest payments with not principal.  An example of an interest-only MCA Agreement Haagen Dazs entered into with CBSG is attached hereto as **Exhibit 32**, which is an August 26, 2016 MCA Agreement between Haagen Dazs that only provided for a purchase price ($25,000) and weekly remittances of $500 with no repayment amount.

290.     The August 26, 2016 MCA Agreement's redaction of a term or repayment amount, which was included on other Haagen Dazs CBSG MCA Agreements, like the one attached hereto as **Exhibit 33**, was intentional because CBSG preyed on the spiraling debt nature of the MCA Agreements they had already entered into with Haagen Dazs to extort these interest only MCA Agreements.

291.     They worked as follows:  Haagen Dazs would receive a principal payment of $25,000, such as the case of the August 26, 2016 MCA Agreement, and have a weekly withdrawal amount of $500.  **However**, this weekly amount was never used to repay the loan's repayment amount because there was none.  Instead, it acted as perpetual interest payments that CBSG continued to take from Haagen Dazs every week until Shah had to sell the franchise in late 2017 due to it being overwhelmed with debt owed to CBSG.

292.     Through the course of these dozen or so MCA Agreements, funded in whole or in part by Defendants, CBSG was collecting approximately $10,000 per week, much of which was never used to pay down any of the loans but was treated as perpetual interest payments that only stopped when Shah was forced to sell his Haagen Dazs franchises in late 2017 for approximately

-62-

$40,000, which he had to immediately hand over in person to Joseph LaForte, James LaFote and Gioe to pay off as much debt as he could.

293. When the Haagen Dazs CBSG MCA Agreements actually had principal, it ranged from $25,000 to $100,000. These usurious loans funded in whole or in part by Defendants carried a typical annual interest rate ranging from 36% to over 100%, just as Defendants were told by the Enterprise before agreeing to Fund the MCA Agreements.

294. After selling Haagen Dazs to pay off as much debt to CBSG as possible, CBSG, through meetings between Shah and Gioe and threatening emails from CBSG telling Shah they had been visiting his home looking for him with pictures of his home included, continued to pressure Shah into repaying even more.

295. This forced Shah to enter into two MCA Agreements with CBSG using his family company ASB that he was then a minority owner of and an officer.

296. Specifically, ASB entered into an MCA Agreement with CBSG that expressly laid out specific and definite repayment terms because these MCA Agreements, as Defendants knew before they funded them, were absolutely repayable loans.

297. The first MCA Agreement between ASB and CBSG was entered into on December 6, 2017, and provided the below loan terms that, on their face, yield an annual interest rate of 59%:

| Purchase Price: $65,000.00 | WEEKLY Specified Amount: $2,356.25 PER WEEK for 40 WEEKS | Receipts Purchased Amount: $94,250.00 |
|---|---|---|

298. The second MCA Agreement between ASB and CBSG was entered into on January 22, 2018, and provided the below loan terms that, on their face, yield an annual interest rate of 90%

| Purchase Price: $150,000.00 | WEEKLY Specified Amount: $8,365.38 PER WEEK for 26 WEEKS | Receipts Purchased Amount: $217,500.00 |
|---|---|---|

299.     After ASB paid off the first MCA Agreement with CBSG and while it was then struggling to make payments on the even more usurious December 6, 2017 MCA Agreement, it eventually fell behind on payments to CBSG, which prompted CBSG to force Shah's wife to issue a mortgage lien on Shah's personal home on May 8, 2018, attached hereto as **Exhibit 34.**

300.     This mortgage lien was not, however, for the repurchase amount of $217,500. Instead, CBSG fraudulently increased the lien amount to $275,000 as further coercive tactics to ensure CBSG could collect unlawful debt.  *Id.* at 2.

301.     This $275,000 mortgage lien remains on the Shah's home notwithstanding hundreds of thousands of dollars Haagen Dazs, ASB, or Shah personally had made between 2014 and 2018 on various usurious loans disguised as MCA Agreements and funded by Defendants.

302.     Notably, Shah and his companies Haagen Dazs and ASB have tried in vain to obtain compensation from the SEC Receiver.  Instead of the Receiver handling his claim in "good faith" as required by orders issued in the SEC Action, Shah was given the run-around and constantly passed around by various agents of the Receiver.

303.     Finally, when Shah connected with the Receiver, rather than discuss how the Receiver could make him and his businesses whole, the Receiver demanded that Shah and his companies pay the Receiver so that the Receiver could turn-around and give that money right back to investors like Defendants who knowingly conspired with CBSG to fund the usurious loans that crushed Shah personally and his businesses.

C.     **Petropengea & Harrison – Texas Victims**

304.     Petropangea, Inc. ("Petropangea") is an independent broker providing wholesale petroleum products on a global scale to the oil and gas industry to include drilling, offshore, resellers, construction, and petrochemical.

-64-

305. Petropangea is a Texas corporation located in League City, Texas, and Johnny Harrison ("Harrison") is the owner and operator of the company.

306. Petropangea entered into an MCA Agreement with the Enterprise on April 4, 2019. The Enterprise funded the loan using Defendants' investment of $25,000 and interest was $33,750. Petropangea was required to make fixed daily payments of $281.25.

307. The term of the Petropangea MCA Agreement was 120 business days, yielding an interest rate of 187%, which is multiple times greater than the usurious interest rate set forth under both Texas and Florida law.

308. On or about May 21, 2019, Petopangea was contacted by its bank, Capital One, NA's fraud division about a voided check that had been forged and cashed.

309. This check that was forged was a voided check that Petopangea previously sent to CBSG as a condition for the loan that Defendants funded in whole or in part.

310. Petropangea notified CBSG that the account was frozen and that CBSG would be unable to debit the account.

311. Petropangea further advised CBSG that the account was frozen and that CBSG would be unable to debit the account.

312. CBSG treated this excusable inability to debit Petropangea's account as a default, knowing that CBSG was directly and/or indirectly responsible for the forgery that necessitated the bank freezing the account.

313. The Enterprise responded by filing a confessed judgment against Petropangea and Harrison for $28,350.52 on June 13, 2019, and also assessed attorney's fees in the amount of $1,348.13.

314. After confessing judgment, the Enterprise also filed a UCC Lien in Texas.

-65-

315.    As a result, some of Petropangea's customers responded by simply not paying outstanding invoices, which caused tremendous strain on the business.

316.    Other of Petropangea's established customers  sent money to CBSG as directed by the UCC Notices they received and then stopped doing business with Petropangea.

317.    Two of Petropangea's oldest customers of over 13 years stopped doing business with it after they were harangued by CBSG's numerous phone calls and harassing tactics.

318.    As a result of the Enterprise's aggressive tactics, Petropangea experienced a substantial loss of revenue.

319.    Petropangea could not afford to pay the outstanding balance because of the harm that was caused by the Enterprise's usurious loans funded by Defendants and the Enterprise's extortionist tactics.

320.    However, Petropangea needed to stop the harassment of its customers by the Enterprise, so it agreed to a reduced payment of $25,000 in full satisfaction of the debt, and Petropangea paid this amount.

321.    Despite acknowledging that Petropangea had a zero balance, the Enterprise unlawfully and without proper service levied an account at Branch Bank and Trust.

322.    The Enterprise took an additional $6,800 from that account.

323.    Petropangea advised CBSG that the levy violated their settlement agreement, to which CBSG responded that the money would never be refunded.

324.    The Enterprise also knowingly and intentionally collected more than permitted under its confessed judgment.  The judgment was for $28,350.52, and it collected $31,800.

D.      **Volunteer Pharmacy & Frost – Tennessee Victims**

325.    Volunteer Pharmacy, Inc. ("Volunteer Pharmacy") provides prescription and over-the-counter drugs to local residents in Tennessee.  The company is owned and operated by Toby C. Frost ("Frost"), a Tennessee resident.

326.    Between November 5, 2013, and May 16, 2016, Volunteer Pharmacy entered into a series of forty-one (41) MCA Agreements with the Enterprise—funded in large part by Defendants who knew the MCA Agreements were usurious loans and that they would fraudulently be described in interstate wires as purchases of Volunteer Pharmacy's receivables and paid by the Enterprise's use of interstate ACH debits.

327.    Each MCA Agreement between the Enterprise and Volunteer Pharmacy contained the same common terms and conditions, and each charged an interest rate in excess of 100%, in violation of Tennessee's and Florida's usury laws.

328.    Like the Enterprise's other victims, the usurious and unconscionable interest payments pushed Volunteer Pharmacy into financial catastrophe by forcing it to take out more and more usurious loans with the Enterprise, all funded at least in part by Defendants.

329.    In 2016, Volunteer Pharmacy could no longer sustain the onerous daily payments under these MCA Agreements funded by Defendants.

330.    Frost called LaForte and asked for a remittance adjustment/reconciliation for longer payment terms on the loans.  In order to consolidate some of the existing debt and extend the term of the loans, LaForte demanded that Frost put up his home as collateral.  Frost had no choice but to comply with LaForte's demand, so he put up his home as security.

331.    In 2017, Volunteer Pharmacy began missing payments on the usurious MCA Agreements due to insufficient funds.

-67-

332.     LaForte immediately called Frost to verbally abuse him.  In addition to cursing out Frost, LaForte instructed Frost to obtain payment by any means possible, even if he had to borrow the money from friends or family.

333.     If Frost did not come up with the payment, LaForte threatened to throw Frost's wife and children out of their home and onto the streets because he held a mortgage on their home.

334.     In addition, the Enterprise began calling Volunteer Pharmacy employees to further harass, embarrass and extort payment.

335.     LaForte's and the Enterprise's threats worked and Frost agreed to pay $4,000 per week.

336.     Despite Volunteer Pharmacy and Frost continuing to pay the Enterprise $4,000 each week as agreed, LaForte instructed Gioe to pay Frost a visit.

337.     One late summer evening in 2017, Gioe showed up at Frost's home.

338.     His seven-year-old son answered the door.

339.     Gioe demanded to see his father, and warned the kid that he knew his father was home, and to go get him.

340.     After relaying the message to his father, both Frost's son and his young daughter locked themselves in their parents' bedroom, hiding in fear.

341.     Gioe confronted Frost and asked why he doesn't pay his bills.  He informed Frost that he had been sent by LaForte, and that he had just gotten back from a visit in Texas where a merchant pulled a shotgun on him.

342.     Gioe left without incident, but the message was received.

343.     Volunteer Pharmacy and Frost continued to make $4,000 weekly payments to the Enterprise over the next two years.

344.    In November 2019, Frost demanded an accounting of everything he received and paid to date.  The Enterprise claimed Volunteer Pharmacy still owed $281,539, despite paying $1,426,491 more than advanced.

345.    On January 27, 2020, the Enterprise threatened to harass Frost's wife, sending the following text:

> This is not a game.  How would your wife feel if she were to wake up tomorrow morning to find that all of your banking assets had been frozen because you refused to repay your legal obligation here?...
>
> Camila Savin ... Camila Williamson

346.    The Enterprise followed through with their threats and sent numerous text messages to Frost's wife that same day.

347.    The Enterprise also sent Frost a text message informing him that the debt owed to CBSG was absolutely repayable even if Volunteer Pharmacy was no longer operational, and that if he failed to pay, all of his personal income and assets would be seized.

**E.    Radiant & Wolfe—California Victims**

348.    Radiant Images, Inc. ("Radiant") is an award-winning service provider to the motion picture industry located in Los Angeles, California, where its co-founder Gianna Wolfe ("Wolfe") lives as well and operates Radiant from.

349.    For more than 10 years, Radiant has provided the motion picture industry with 2D, 3D, VR, and augmented reality solutions and access to various specialized film equipment through its rental services.

-69-

350.    In early 2015, Radiant was suffering financial difficulties and it needed to quickly obtain additional financing in order to meet its daily operating needs and expand its business.

351.    In or around this time, CBSG contacted Radiant to determine if Radiant was in the need of cash for its business.

352.    Once appraised of Radiant's need, CBSG brokered a series of MCA Agreements with Radiant and the Enterprise—funded at least in part by Defendants and personally guaranteed by Wolfe.

353.    In total, Radiant, with Wolf acting as guarantor, entered into dozens of MCA Agreements between 2015 and January 2018, each with an annual interest rate of at least 80%—higher than the interest rate limits imposed by Florida and California usury laws.

354.    To secure performance of the daily or weekly interstate ACH withdrawals pursuant to these usurious loans, the Enterprise required Radiant to grant it a security interest in virtually all of its assets, in addition to Wolfe being required to personally guarantee Radiant's performance of the representations, warranties and covenants under the Agreements.

355.    When Radiant could not make the daily or weekly payments required by the MCA Agreements, the Enterprise would offer Radiant and Wolfe new MCA Agreements with similarly onerous and usurious terms (again funded at least in part by Defendants), and use the proceeds to pay off the old MCA Agreements, leaving Radian with very little "new cash" under each MCA Agreement and launching Radiant and Wolfe into a never ending spiral of debt from which the Enterprise knew the Radiant and Wolfe could never come out of.

356.    In reality, as Defendants knew, these MCA Agreements are a chain of usurious loans that pushed Radiant and Wolfe into an unsustainable level of indebtedness in a relativity

-70-

short period of time, creating circumstances under which the Enterprise could then go after not only the assets of Radiant, but also the personal assets of Wolfe.

357.    In order to obtain the loans, Radiant was required to grant CBSG "a security interest in (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventors . . . now or hereafter owned or acquired by [Radiant] and (b) all proceeds, as that term is defined in Article 9 of the UCC[.]"

358.    The security agreement in the MCA Agreements further provided that, upon default, the Enterprise "may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing, whether by acceleration or otherwise."

359.    Wolfe was also required to personally guarantee performance of the representations, warranties, and covenants under the MCA Agreements.

360.    Further, should Radiant ever enter bankruptcy, the MCA Agreements provided "Protections 2 [confession of judgment] and 3 [enforcement of security interest in collateral] are immediately invoked."  The guaranty signed by Wolfe further allowed the Enterprise recourse against Wolfe personally if the debt balance could not be collected due to Radiant's bankruptcy.

361.    In or around January 2018, Radiant and Wolfe came to the realization that they would soon have trouble making payments to the Enterprise.

362.    To prevent this from occurring, Radiant reached out to the Enterprise numerous times to request that the required daily payment to be lowered, something that should be easy to achieve if the MCA Agreements did not fraudulently—as Defendants knew—represent they were purchase of receivables.

363.   In fact, Radiant and Wolfe provided the Enterprise with a copy of Radiant's bank accounts to show the Enterprise that it did not have sufficient receivables to make the daily and/or weekly payments.

364.   In response to each of Radiant's requests, the Enterprise summarily and without cause denied each one, suggesting that the parties "talk next week."

365.   Ultimately, Radiant became unable to make payments on the MCA Agreements on or about February 15, 2018.

366.   In response, the Enterprise began a vicious campaign involving threats to the lives of Radiant's founds and the reputation of the business.

367.   First, the Enterprise sent Gioe, the physically imposing, former federal-prison inmate with reputed ties to an organized crime family to Radiant's offices, as described above.

368.   Gioe, knowing the illegal nature of his impending actions, signed into Radiant's building using a false name.

369.   Gioe the enforcer then spoke to the other co-founder of Radiant, Michael Mansouri ("Mansouri") and made thinly veiled threats against Mansouri's and Wolfe's lives.

370.   Gioe the enforcer told Mansouri that in deciding to cease payments to the Enterprise, Wolfe and Mansouri made a decision that "affects wives and children."

371.   Gioe the enforcer then proceeded to tell Wolfe and Mansouri the story of another borrower who was unable to make payments to the Enterprise.  Gioe stated that he was driving to the debtor's business and came across an accident that just so happened to involve the borrower.

372.   From this conversation, Wolfe and Mansouri naturally inferred that the borrower's accident was related to missed payments to the Enterprise.

32195532v.3

373.    More despicable, on February 16, 2018, Joe LaForte told Gioe that he was done with Wolfe and Mansouri and to "take care of him."

374.    As a result of these threats against their lives, Wolfe and Mansouri immediately filed a report with the Los Angeles Police Department, informing the police that they were scared for their lives.

375.    The Enterprise's threats also affected Radiant's employees; they stated that while they loved working for Radiant, they do not love it enough to be killed for it.

376.    In addition to the threats made to Wolfe and Mansouri, the Enterprise harassed Radiant's customers and business associates.

377.    When no additional payments were received, CBSG notified Radiant's customers and non-customers to inform them of the debt.

378.    On February 16, 2018, CBSG sent Radiant's customers an email that stated:

> We have purchased the future receivables for Radiant Images Inc. DBA HD Camera Rentals. Please see the attached correspondence which details said transaction. Despite our contractual agreement, Radiant Images Inc. DBA HD Camera Rentals has since defaulted on their payment. Accordingly, per UCC 9-406, please allow this correspondence to serve as a request that you hold all funds payable to Radiant Images Inc. DBA HD Camera Rentals in reserve until $2,651,880.22 is accrued.

379.    The email also contained a notice, purportedly prepared by CBSG's attorney, that indicated that all payments should be forwarded to CBSG.  *See* **Exhibit 35** attached hereto, which included LaForte as a copied person under the fake name "Joe Mack."

380.    Further, CBSG informed at least 19 other members of the American Society of Cinematographers, an invitation only organization where only directors of photography and special effects experts with distinguished credentials were asked to join, of Radiant's debt.

381.     The American Society of Cinematographers, however, is not one of Radiant's account debtors.  Upon information and belief, this communication was sent either (1) without the Enterprise conducting any due diligence to determine of the organization was Radiant's account debtor, or (2) solely to embarrass Radiant and force them to make additional payments on the MCA Agreements—funded at least in part by Defendants.

382.     As a result of these harassing notices and emails by the Enterprise, Radiant lost profits and clients and its reputation within the industry was significantly tarnished.

383.     As a direct and proximate result of the financial strain resulting from each usurious MCA Agreement, Radiant and Wolfe were forced to enter into additional usurious MCA Agreements with CBSG to stay afloat—all funded at least in party by Defendants knowing that the MCA Agreements imposed usurious interest rates.

384.     As a direct and proximate result of these loans, Radiant and Wolfe paid interest in excess of that is allowed by California law and Florida law.

385.     As a direct and proximate result of each of these usurious loans and the Enterprise's subsequent collection tactics, Plaintiffs suffered indivisible injury through lost profits.

## F.      Flexogenix, Whalen & Chen – California Victims

386.     Flexogenix Group, Inc. ("Flexogenix") operates joint care clinics in the Los Angeles, California area and in several other U.S. cities as an affiliate.

387.     Flexogenix is owned and operated by Sean Whalen ("Whalen") and Yingyin Iris Chen ("Chen").

388.     Between November 21, 2017, and September 12, 2018, Flexogenix paid the Enterprise nearly $800,000 in unlawful interest under three prior MCA Agreements—funded at least in part by Defendants who knew they were funding usurious loans.

-74-

389.    The terms of these Flexogenix MCA Agreements are as follows:

| Date of Loan | Amount of Loan | Daily Payment | Payback Term | Total Payback | Interest Rate |
|---|---|---|---|---|---|
| 11/21/2017 | $1,000,000.00 | $ 6,331.06 | 237 days | $ 1,500,000.00 | 151.76% |
| 12/1/2017 | $  500,000.00 | $ 4,406.25 | 160 days | $   705,000.00 | 215.2% |
| 12/21/2017 | $  250,000.00 | $ 2,556.81 | 132 days | $   337,500.00 | 215.81% |
| **Totals** | **$ 1,750,000.00** | | | **$ 2,542,500.00** | |

390.    The usurious, unlawful, and unconscionable interest payments on these MCA Agreements funded at least in part by Defendants pushed Flexogenix into financial catastrophe by causing it to take out more and more usurious MCA Agreements with CBSG, which were also funded at least in part by Defendants.

391.    The terms of these additional MCA Agreements are as follows:

| Date of Loan | Amount of Loan | Daily Payment | Payback term | Total Payback | Interest Rate |
|---|---|---|---|---|---|
| 9/12/2018 | $ 900,000.00 | $ 6,331.06 | 199 days | $ 1,260,000.00 | 150.5% |
| 10/1/2018 | $ 800,000.00 | $ 5,628.14 | 199 days | $ 1,120,000.00 | 150.6% |
| 10/24/2018 | $1,200,000.00 | $ 7,304.35 | 230 days | $ 1,680,000.00 | 120.2% |
| 11/20/2018 | $1,000,000.00 | $ 5,600.00 | 250 days | $ 1,400,000.00 | 106.99% |
| 12/17/2018 | $  500,000.00 | $ 2,800.00 | 250 days | $   700,000.00 | 106.99% |
| **Totals** | **$ 4,400,000.00** | | | **$ 6,160,000.00** | |

392.    As a direct result of the Enterprise collecting unlawful debt pursuant to these MCA Agreements funded by Defendants, Flexogenix was ultimately forced to file for Chapter 11 bankruptcy protection.

393.    Although the MCA Agreements purport to only purchase future receivables—a fraud Defendants fully understood before agreeing to fund the Enterprise's MCA Agreements—

-75-

their true substance as loans is proven not only by the marketing materials Defendants reviewed before funding the Enterprise, but also by CBSG's subsequent actions.

394.   CBSG filed a lawsuit against Chen, and Whalen, two who were purportedly personally liable for the full unpaid balance of the MCA Agreements through their personal guarantees that made them responsible for this debt in the event of Flexogenix's bankruptcy.  *See Complete Business Solutions Group, LLC v. Sean Whalen*, 2:19-cv-06181-JS (E.D. Pa.).

395.   Flexogenix, Chen, and Whalen filed counterclaims against CBSG in that lawsuit, but the lawsuit was stayed due to the SEC Receiver's actions in the SEC Action, who also denied their claims to recovery from the receivership estate.

396.   As a result of the Enterprise's, Defendant's and the SEC Receiver's conduct, Flexogenix, Chen and Whalen have suffered, and continue to suffer, substantial injury to their business and/or property as they had to pay millions in usurious interest under California and Florida law to the Enterprise and ultimately were forced into bankruptcy.

**G.     Fleetwood, Mr. Fleetwood & Mrs. Fleetwood – Texas Victims**

397.   Fleetwood Services, LLC ("Fleetwood") is a small Texas business providing golf course construction, development, renovation and remodeling based in Dallas, Texas.

398.   Mr. Robert L. Fleetwood ("Mr. Fleetwood") and Mrs. Pamela A. Fleetwood ("Mrs. Fleetwood") own and operate Fleetwood.

399.   Mrs. Fleetwood has no financial experience and her highest level of education is a high school diploma.

400.   Mr. Fleetwood has an associate degree in general studies, and is by trade a construction worker.

-76-

401.    Like many construction businesses, Fleetwood does not immediately get paid for its services.  Rather, it provides the services to its customers and invoices the customers on 30-60 date terms.  Thus, there is a delay between the time Fleetwood generates a receivable and gets paid which, at times, can cause cash flow issues for the company.

402.    As a result, like many thousands of other small business victims, Fleetwood was induced into a never-ending series of MCA agreements, whereby Fleetwood was forced to take out new MCA agreements just to pay off the prior MCA agreements in a never-ending cycle of usurious debt.

403.    By January 2017, Fleetwood and its owners were drowning in usurious MCA debt, they had at least six other MCA agreements that required onerous daily payments that Fleetwood could not afford to pay.

404.    CBSG understood Fleetwood's position and sensed its vulnerability, and CBSG approach Fleetwood and its owners in or around January 2017, promising to consolidate and lower their existing payments and lower the interest that they were previously paying under their existing MCA agreements,

405.    As part of these discussions, CBSG presented Fleetwood and its owners with a take-it-or-leave-it MCA Agreement, funded in part by Defendants, which falsely represented that CBSG was purchasing Fleetwood's future receivables, a fraud Defendants were well aware of before funding MCA Agreements like those entered into between CBSG and Fleetwood.

406.    On or about January 4 2017, Fleetwood in its dire financial straits capitulated to CBSG's unconscionable and usurious MCA Agreement offer and entered into the agreement, the financial terms of which provided as follows:

-77-

| Purchase Amount | Purchase Price | ACH Payments | Other Fees | "Specified Percentage" | Undisclosed APR |
|---|---|---|---|---|---|
| $370,000 | $547,600 | $5,000.25 x 110 | $995.00 | 25% | 114.07% |

407.    The 114% interest rate assessed on the Fleetwood MCA Agreement—fully consistent which what Defendants were told by the Enterprise prior to Defendants joining the scheme by funding MCA Agreements like this one with Fleetwood—is multiple times higher than the rate of interest allowed under both Texas and Florida usury laws.

408.    The terms of the Fleetwood MCA Agreement (funded at least in part by Defendants), but were not limited to:

a.    In exchange for providing a total of $370,000.00, Fleetwood became obligated to repay $547,600.00 by way of 110 payments of $5,000.25, with payment in full estimated to be made by June 12, 2017;

b.    Full recourse protection for Defendant CBSG in event of default or bankruptcy. Fleetwood was required to execute a security agreement; Mr. Fleetwood and Mrs. Fleetwood were required to execute personal guarantees as well as confessions of judgment as a condition of the transaction, thereby permitting Defendant CBSG to immediately seize Fleetwood's business assets as well as the personal assets of Mr. Fleetwood and Mrs. Fleetwood and to obtain a Judgment by Confession without even notifying them;

c.    Fleetwood was required to turn over all its user names, passwords and bank account information.  Any attempt by Fleetwood to change either the user name or password without advising Defendant CBSG was defined as an event of default;

d.    Failure by Fleetwood to make the daily fixed payment was defined as an event of default, even if Plaintiff Fleetwood Services had no receivables that day;

e.    A purported 25% was identified as the specified percentage of receivables at issue, which had nothing to do with the terms of repayment other than to appear as though that was the percentage of interest being charged for the loan; and,

f.    Substantial fees could be assessed by CBSG for, including but not limited to, insufficient funds ($75.00 each up to four times before default declared), rejected ACH attempts ($100.00), change of bank accounts ($50.00), default fee ($5,000), and collection expenses in event of default.

-78-

409.     The purported fair market value of Fleetwood's future receivables was unilaterally dictated by CBSG and was based upon the credit worthiness of Fleetwood.  In contrast, a true factoring agreement determines the fair market value of the receivable, based on the credit worthiness of the customer who is expected to pay the receivable.

410.     CBSG's fixed daily debits on the Fleetwood MCA Agreement had nothing to do with any calculation of Fleetwood's receivables.  Rather, any and all receivables from any customer in any amount based on any sale is subject to transfer to CBSG for payment of the daily fixed debit.

411.     Pursuant to the terms of the Fleetwood MCA Agreement, as opposed to a true factoring arrangement, Fleetwood, Mr. Fleetwood, and Mrs. Fleetwood bared the entire risk of a customer not paying, rather than CBSG.

412.     In reality, the true purpose of the MCA Agreement was to protect the financial interests of CBSG, while increasing Fleetwood's dependence on future loans, because the debt consolidation program offered by CBSG was designed to fail.

413.     In furtherance of their fraudulent and deceptive scheme, CBSG fraudulently and/or negligently induced Fleetwood to enter into the purported debt consolidation program by making knowingly false and misleading representations such as that "the purpose of the [CBSG] consolidation funding program is for [Fleetwood] to move away from cash advance companies."

414.     CBSG repeatedly represented that the consolidation funding would alleviate daily cash flow concerns by reducing Fleetwood's daily ACH debits from $6,667.00 per business day to $5,000.25, a savings represented to be of approximately $1,666.75 each business day.

415.     In an effort to intentionally mislead and/or negligently make Fleetwood believe that its cash flow would improve, CBSG represented that it would be wiring in a set amount of cash

infusion over an initial nine (9) weeks of the loan, so that those funds could be used to make Fleetwood's payments to other MCA lenders. However, by the time CBSG took the 33rd ACH from Fleetwood's bank account, all of the upfront cash infusion that was used to induce Fleetwood into the debt consolidation program was used up. As a result, Fleetwood was left paying thousands of dollars more to CBSG than it had been paying prior to the debt consolidation program offered.

416.   CBSG conspired to make these knowingly false, misleading and/or negligent representations in an intentional attempt to lead Fleetwood to believe that this consolidation program would improve its cash flow, when in actuality, it was purposefully and/or negligently designed to worsen Fleetwood's cash flow, and thereby increasing its dependence on further MCA Agreement loans exclusively from CBSG using funds from Defendants. In fact, another hidden term of the Fleetwood MCA Agreement conveniently limited Fleetwood to seeking any further business loans exclusively from CBSG.

417.   The cash flow benefit touted by CBSG not only quickly evaporated over the life of the usurious MCA Agreement but resulted in a longer loan term and the payment of additional interest. As expected and intentionally designed, the daily payments under the debt consolidation program forced Fleetwood to either come up with its own additional capital or borrow even more money from CBSG. Coincidentally, it was about that time that Fleetwood became financially strained from the existing relationship with CBSG, that it was offered an opportunity by CBSG to refinance its remaining balance, at a reduced daily rate, but for an extended additional period of time.

418.   During the course of the Fleetwood MCA Agreement, there were days when there were insufficient funds to cover the daily ACH debit taken by CBSG. On a number of occasions, threats were made by a representative at CBSG that unless payments in full were made, a default

-80-

would be declared.  Further, Mr. and Mrs. Fleetwood were warned that if default was declared they would lose the business, their house, and all their personal assets.  These threats caused tremendous emotional and mental distress to Mr. Fleetwood and Mrs. Fleetwood since everything they owned was at risk of seizure and/or foreclosure.

419.    Moreover, in direct conflict with the sham reconciliation provision of the MCA Agreement, CBSG charged Fleetwood over $11,000 in admitted "Finance Charges" in exchange for lowing the daily payment amount:

| 03/16/17 | $ 5,000.25 | $ 312,588.25 | Payment |
| 03/17/17 | $ 3,250.00 | $ 309,338.25 | Payment |
| 03/17/17 | $ (7,001.00) | $ 316,339.25 | Finance Fee |
| 04/28/17 | $ 5,000.25 | $ 209,712.25 | Payment |
| 05/01/17 | $ 3,000.00 | $ 206,712.25 | Payment |
| 05/01/17 | $ (4,000.00) | $ 210,712.25 | Finance Fee |

420.    That is absolutely not how a factoring agreement works, but it is exactly how a loan works, which Defendants understood the Enterprise's MCA Agreements to be before agreeing to fund the Enterprise.

421.    Even more troubling, CBSG charged Fleetwood this "Finance Fee" even though there is absolutely no right to charge a "Finance Fee" anywhere in the Fleetwood MCA Agreement that Defendants funded at least in part.

422.    After being trapped in CBSG's tentacles without the ability to put an end to the debt consolidation scheme, Fleetwood finally qualified for a Small Business Loan with a traditional lender.  On July 5, 2017, Fleetwood was able to pay-off CBSG in full.  Nevertheless, Fleetwood

-81-

continued to receive calls from brokers and lenders seeking to tempt Fleetwood with additional merchant cash advances.

423.    By reason of the foregoing, Fleetwood and its owners are entitled to recover against Defendants an amount to be determined at trial, but in any event, not less than $1,021,360 based on the financial terms of the usurious MCA Agreement and Texas usury laws, not including trebled damages Fleetwood and its owners are entitled to under the RICO statute.

**H.      TourMappers & Katz – Massachusetts Victims**

424.    TourMappers North America, LLC ("TourMappers") is a Massachusetts-based international, inbound travel company, servicing international tour operators who in turn sell the product to individual customers.   All of TourMappers business comes from overseas. TourMappers is owned and administrated by Julie Katz ("Katz").   The business relies on tourist activity, which is seasonal, with its peak in the spring and summer and its lowest point during the winter.

425.    On January 10, 2020, TourMappers entered into an MCA Agreement with CBSG— funded in part by Defendants who knew that MCA Agreements by CBSG imposed usurious interest rates—with Katz providing a personal guarantee that would hold her liable for any unpaid debt thereunder should TourMappers declare bankruptcy.

426.    Pursuant to the TourMappers MCA Agreement, CBSG advanced $150,000 to TourMappers in exchange for the purported purchase of 10% of the monetary proceeds of TourMappers future sale (the "Future Receipts") until such time as the Receivables Purchase Amount of $208,500 was repaid in full—all fraudulent terms in the MCA Agreements as Defendants knew because these MCA Agreements they funded were explicitly described as

-82-

"loans" that were absolutely repayable, which is what enticed Defendants to fund MCA Agreements like the one entered into by TourMappers.

427.     The Receivables Purchased Amount was to be repaid through the weekly specified amount using interstate ACH withdrawal from TourMappers' designated bank account, each in the equal amount of $10,425, for 20 weeks, which translates to an effective annual interest rate of more than 257%—multiple times higher than the interest limit imposed by both Massachusetts and Florida usury laws.

428.     After the TourMappers MCA Agreement was executed, CBSG initiated weekly withdrawals in the amount of $10,425 per week from TourMappers' designated account using interstate ACH debits, just as described to Defendants before they funded the Enterprise's MCA Agreements.

429.     On March 12, 2020, upon receiving news of the United States Government's decision to close internal borders and halt travel due to the impending threat of the COVID-19 pandemic, TourMappers reached out to CBSG to request a reduction of weekly payment based on the reduced (or absent) receivables it was earning—a request that should have immediately been granted had the MCA Agreement not been a loan as Defendants knew before investing in the Enterprise.

430.     Rather than granting TourMappers' reconciliation or remittance adjustment request, on March 13, 2020, CBSG arbitrarily and in breach of the TourMappers MCA Agreement began withdrawing $950 per day from TourMappers' designated bank account.

431.     On March 16, TourMappers once again reached out to CBSG to required that the withdrawals be reduced given that its receivable intake had effectively entirely halted due to the COVID-19 pandemic and restrictions on international travel.

-83-

432.     Unlike a true purchase of receivables where such an event would entitle CBSG to nothing because factoring agreements encompass some form of risk on the part of the purported purchaser of future receipts, CBSG treated the MCA Agreement as an absolutely repayable loan and merely reduced its daily ACH debits to $300 daily—an amount still overwhelming for TourMappers given that it was presently receiving zero income.

433.     TourMappers continued to reach out to CBSG, each time speaking with a different individual.  Each time being directed to speak to one person or another—that predictably turned out to be unreachable—for approximately two weeks.  TourMappers requested that CBSG place a temporary hold on daily withdrawals until the U.S. borders were reopened due to their then total lack of receivables.

434.     On March 24, 2020, CBSG asked TourMappers to provide account information. TourMappers complied and forwarded the information which reflected a total amount of approximate $1,200 in its designated bank account—which was all the money available to TourMappers and Katz both business and personal—which Katz combined because she was afraid of missing payments under the MCA Agreement funded by Defendants that she entered into with CBSG.

435.     Notwithstanding this documented proof that TourMappers was not earning any receivables, on March 26, 2020, CBSG began withdrawing $25 per day.

436.     On April 8, 2020, after numerous attempts to place on temporary hold on CBSG's withdrawals—which TourMappers would have been entitled to if this MCA Agreement was a legitimate purchase of receivables rather than a loan as described to Defendants—TourMappers and Katz placed a "stop payment" on the bank account CBSG was withdrawing from.

437.    On April 9, 2020, undeterred, CBSG once again withdrew money from this TourMappers account—this time under the "Complete Business Auto Pa" withdrawal name, instead of "Par Funding CC Trans Tour"—as it had done since the signing of the MCA Agreements in prior months as an end-around of the "stop payment" placed by Katz and TourMappers.

438.    On or about April 10, 2020, TourMappers placed a "stop payment" on Complete Business as well.

439.    On April 21, 2020, a settlement company contacted Katz to inform her that she had a lawsuit pending against her and inquired as to whether she was interest in working with the company to resolve the matter.

440.    Katz subsequently reached out to CBSG who informed her that the referenced lawsuit could be a confession of judgment and that CBSG would look into it.  Katz was given the name of a CBSG employee she was supposed to speak to, but after numerous attempts, was unable to reach that individual.

441.    CBSG had, in fact, filed a confession of judgment against TourMappers and Katz personally in the action *Complete Business Solutions Group, Inc. v. TourMappers North America, LLC, et al.*, Philadelphia Cnty. Court of Common Pleas, C.A. No. 200401028.

442.    The confession of judgment filed by CBSG against TourMappers and Katz was entered without authority and in violation of the terms of the MCA Agreement Defendants funded, at least in part.  But neither TourMappers nor Katz received a copy of the confession of judgment until days after these events occurred.

443.    Pursuant to the express terms of the TourMappers MCA Agreement Defendants funded for the Enterprise, the confession of judgment was only to be filed upon TourMappers refusing to pay the receivables CBSG purportedly purchased—Defendants, of course, knew that

-85-

these MCA Agreements were loans and not true purchases of receivables from small businesses like TourMappers.

444.    The terms of the confession of judgment, drafted by CBSG, are entirely inconsistent with the stated requirements of the MCA Agreement that Defendants funded in part or in whole.

445.    As TourMappers and Katz repeatedly tried in vain to explain to CBSG, the business was not earning receivables due to the closure of international borders caused by the COVID-19 pandemic.

446.    By the time the stop payments were placed, TourMappers had already attempted numerous times to explain to CBSG that no receivables were being earned and it had nothing to turn over to CBSG.

447.    The business interruption that led to TourMappers' complete lack of receivables was caused by unforeseeable events that could not have prevented or addressed by TourMappers— but as Defendants knew before funding the TourMappers MCA Agreements and others just like it, the TourMappers MCA Agreement was not a real purchase of receivables, CBSG was entering into usurious absolutely repayable loans with borrowers like TourMappers.

448.    By treating the TourMappers MCA Agreement as a loan—which Defendants understood before investing in these MCA Agreements—CBSG treated the MCA Agreement as an absolutely repayable loan and bargained for the authority to file the confession of judgment upon TourMappers' and Katz's failure to make payments, notwithstanding that TourMappers had no receivables.

449.    CBSG's affidavit filed in connection with the confession of judgment also grossly understated how much TourMappers had paid CBSG as of the date of the affidavit.  According to

-86-

CBSG's affidavit, as of April 21, 2020, TourMappers had an unpaid balance of $121,379.55 under the MCA Agreement, when, in fact, it had made payments totaling $108,520.45.

450.    In reliance on CBSG's fraudulent statements in the confession of judgment and affidavit, the Court entered judgment against TourMappers and Katz in the amount of $127,687.96, inclusive of costs and attorneys' fees calculated under an unenforceable liquidated damages attorneys' fee formula in the affidavit filed by CBSG.

451.    The TourMappers MCA Agreement did not contain such a formula for liquidated attorneys' fees.

452.    CBSG's tactics and the MCA Agreement funded by Defendants had a crushing impact on TourMappers' business.

453.    To date, TourMappers has paid CBSG the aggregate amount of $108,520.45 on a purported $208,500 purchased receivables—of which only $150,000, after fees, constituted the advance by CBSG.  The advance was funded in part or in whole by Defendants.

I.      **MH Marketing & Heller – New Jersey Victims**

454.    MH Marketing Solution Group, Inc. ("MH Marketing") is an online advertising and marketing company based in New Jersey.  It is owned and operated by Michael Heller ("Heller"), a New Jersey resident.

455.    MH Marketing entered into two MCA Agreements with the Enterprise, funding at least in part by Defendants.

456.    The first was entered into on October 24, 2018.  The loan amount was $250,000 and the principal and interest was $387,500.

457.    As expressly negotiated by the parties. MH Marketing was required to repay the loan in 250 business days through 250 fixed interstate ACH daily debits of $1,550.  This yields an

annual interest rate on the face of the MCA Agreement of 175%—multiple worlds higher than the usurious interest limit imposed by New Jersey and Florida law.

458.    Most notably, in securing the loan, the Enterprise required Heller to mortgage his New Jersey home.  The Enterprise expressly defined the MCA Agreement as a loan, reflected below, just as Defendants understood it to be before funding the Enterprise.

> (A) **"Security Instrument"** means this document, which is dated October 25, 2018, together with all Riders to this document.
> (B) **"Borrower"** is Michael Heller.  Borrower is the mortgagor under this Security Instrument.
> (C) **"Lender"** is Complete Business Solutions Group, Inc.  Lender is a corporation organized and existing under the laws of the State of Delaware.  Lender's address is 20 North 3rd Street, Philadelphia, Pennsylvania 19106.  Lender is the mortgagee under this Security Instrument.
> (D) **"Note"** means the Factoring Agreement signed by Borrower and dated October 25, 2018.  The Note states that Borrower owes Lender Three Hundred Eighty-Seven Thousand Five Hundred and 00/100 Dollars (U.S. $387,500.00) plus fees.
> (E) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
> (F) **"Loan"** means the debt evidenced by the Note, plus fees, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus fees.

459.    The second MCA Agreement—also funded in part by Defendants—was entered into on January 22, 2019.  The loan amount was $25,000 and the principal and interest was $31,500.

460.    As expressly negotiated by the parties, MH Marketing was required to repay this loan in 20 weeks through 20 fixed weekly interstate ACH debits of $1,575, yielding an annual interest rate on the face of the loan of 158%— again multiple worlds higher than the usurious interest limit imposed by New Jersey and Florida law.

461.    In May 2019, MH Marketing had lost its largest client and could no longer keep up with the onerous terms dictated under the MCA Agreement, which would not have been a problem had the MCA Agreement actually been a legitimate purchase of MH Marketing's receivables, but as the Enterprise and Defendants knew, this was not a purchase of receivables, it was a loan.

462.    After informing CBSG that MH Marketing could not make payment, LaForte verbally abused Heller, calling him a "moron" and threatening to take his house away.

463.   Upon MH Marketing missing one payment, the Enterprise began a campaign of sending UCC Liens and UCC Notices to MH Marketing's customers and Heller's family and friends.

464.   As a direct result of this harassment campaign, things went from bad to worse.  MH Marketing lost even larger accounts due to the Enterprise's unlawful practices, and its revenue declined precipitously.

465.   In August 2019, the Enterprise initially agreed to a modification of the repayment term, but then immediately confessed judgment against MH Marketing and Heller personally after just one missed payment.

466.   The Enterprise harassed Heller and his wife with repeated phone calls, text messages, and emails, including hundreds of emails to MH Marketing's customers.   As an example, the Enterprise sent the following text to Heller: Fwd:Well, umm… This is awkward… We just sent your wife an email and several text messages with the Deed of Trust pertaining to the Collateral that is your home… We also just emaieled [sic] her the Foreclosure Warning Letter per your default and refusal to pay."

467.   On June 21, 2019, the Enterprise filed a confession of judgment against Heller— even though it had no right to confess judgment against Heller personally.

468.   Under the express terms of the MH Marketing MCA Agreement (funded at least in part by Defendants), CBSG may only confess judgment against the merchant, MH Marketings.

469.   In filing the confession of judgment, the Enterprise filed a knowingly false verified complaint attesting under penalties of perjury that it was entitled to confess judgment against Heller personally.

-89-

470.     As a direct result of the Enterprise's actions and Defendants funding of the MH Marketing MCA Agreements, Heller and his wife were forced to file for Chapter 13 bankruptcy and their home is still at risk of foreclosure.

**J.     B&T Supply, Odzer & Azrak – New York Victims**

471.     B&T is a New York corporation with a principal place of business in Cedarhurst, New York and is run by its owner Tzvi Odzer ("Odzer").

472.     Ruben Azrak ("Azrak") is a personal friend of Odzer.

473.     Between May 15, 2015 and July 17, 2020, the B&T Supply entered into dozens of separate MCA Loans with the Enterprise.

474.     LaForte required Odzer to pay 10% of the amount funded in cash and personally deliver the cash to LaForte.

475.     On paper, B&T Supply received $28,508,659 and paid back $31,975,409.

476.     In addition to these paper payments by B&T Supply, Odzer paid $630,355 from personal funds and $9,088,375 in cash payments.

477.     In total, B&T Supply and Odzer made payments of $13,185,480 in excess of the amount received.

478.     Further, on September 6, 2023, the Receiver, on behalf of CBSG and the Defendant investors in this action, obtained a federal court judgment against Odzer and Azrak personally in the amount of $824,200.15 as a result of a personal loan Odzer was forced to take out at the hands of the Enterprise.

479.     Azrak received no consideration whatsoever from the Enterprise—yet the Receiver sought to further victimize a New York resident who did nothing more than personally guarantee a loan for a friend.

-90-

480.    The total damages suffered by Odzer is at least $14,009,680.15, plus his attorney's fees incurred in defending claims against the Receiver.

481.    The total damages by Azrak is at least $824,200.15, plus his attorney's fees incurred in defending claims against the Receiver.

482.    Notably, the Receiver is continuing to add to these damages by relentlessly pursing collection actions against Odzer, Azrak and B&T Supply through today.

**FLORIDA LAW SHOULD APPLY TO PLAINTIFFS & THE CLASS AS A WHOLE**

483.    The State of Florida has a significant interest in protecting both commercial and individual lenders from entering into loans with usurious interest rates, which Florida law defines as any annual interest rate that exceeds 25%, Fla. Stat. § 687.071, which is far less than the interest rate the Marketing Defendants told the Investor Defendants the MCA Agreements issued by CBSG would carry.

484.    Florida, which seeks to protect commercial borrowers both in Florida and borrowers across the United States from usurious lending practices, has a greater interest in the claims of Plaintiffs and the Class and Subclasses, defined below, than any other state and is most intimately concerned with the claims and outcomes of this litigation.

485.    As set forth in detail above, the CBSG Enterprise had a principal place of business in Florida during the vast majority of the relevant period of unlawful debt collect and wire fraud.

486.    First, McElhone stated in documents filed with the Florida State government that CBSG had a Florida office at 2000 PGA Blvd, Suite 4440, Palm Beach Gardens, FL 33408.  Ex. 11 at 4.  Therein, McElhone listed her address as 107 Quayside Drive, Jupiter, Florida 44377.  *Id.* at 5.

-91-

487.    Second, Barleta testified in his deposition in the PA *CBSG* Action that CBSG <u>does</u> <u>not</u> have an office in Philadelphia, but rather has a "Florida domicile." Ex. 13 at 49:20-50:4. When asked "tell be everyplace CBSG has an office?" Barletta responded with "Just Florida," where McElhone works as CBSG's "President." *Id.* at 172:5-21.

488.    Third, Barleta was also deposed in another civil lawsuit filed against CBSG entitled *HMC Incorporated, et al. v. Complete Business Solutions Group Inc. et al.*, 19-cv-3285 (E.D. Pa.), in which he testified that (1) CBSG has an office in and based out of Florida multiple times and pays no city taxes in Philadelphia; (2) that McElhone, a Florida resident, worked out of CBSG's Florida office; (3) that CBSG's only physical location was in Florida; (4) that Barleta would have daily conversations about the Enterprise business with McElhone while she was in Florida by phone and email; (5) that McElhone made decisions for CBSG from Florida. *See* Ex. 14 at 149:4-159:12, 218:23-222:5 & 270:14-24. Barleta also testified in the *HMC* action that LaForte is the "director of sales at Par Funding." *Id.* 321:2-18

489.    Fourth, when LaForte was deposed in the PA *CBSG* Action, he too testified that "CBSG is located in Florida" and does not have an office in Philadelphia. Ex. 15 at 56:11-16. LaForte reiterated once more in his testimony that "Par Funding is a Florida Company." *Id.* at 60:8-9. He further testified that his wife McElhone works often out of CBSG's office in Florida. *Id.* 62:10-63:14.

490.    Fifth, CBSG's press releases confirm that CBSG d/b/a Par Funding was a Miami based business. Ex. 16.

491.    Sixth and finally, the SEC Action was brought in Florida because of the Enterprises connections to Florida. Ex. 17 ¶ 11 ("Par Funding is a Delaware company Lisa McElhone and her

-92-

husband, Joseph LaForte, started in 2011 . . . and current has its sole office in Palm Beach Gardens, Florida").

492.    Thus, the Defendants, both Marketing and Investor, conspired with a Florida-based RICO Enterprise in order to market and fund loans issued by the Florida-based RICO Enterprise with interest rates of at least 105% annually and 35% on a single loan of less than 100 day term, both of which violate Florida's strong public policy and laws against commercial usury.

493.    Application of Florida law to the Class with respect to Plaintiffs' and Class members' claims is neither arbitrary or fundamentally unfair because Florida has significant contacts with the Enterprise Defendants conspired with and the Enterprise had a significant aggregation of contacts with Florida that establishes Florida law's interest and applicability to the claims of Plaintiffs and the Class.

494.    Under Florida's choice-of-law principles, which are applicable to this action, Florida statutory usury law applies to the nationwide RICO and equitable claims of all Class members.

495.    Additionally, given Florida's significant interest in regulating the conduct of the RICO Enterprise that Defendants conspired with which operated in its borders, and that Florida has the most significant relationship to the Enterprise Defendants conspired with, and that the Enterprise's officers and offices are located in Florida from which decisions were made with Defendants that have given rise to the allegations and claims asserted herein, in Florida, there is not conflict in applying Florida law to non-resident merchants or individuals such as some of the potential Class members.

## CLASS ALLEGATIONS

496.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

497.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3)

498.    Plaintiffs B&T, Haagen Dazs, and ASB (collectively the "Merchant Plaintiffs") bring this action individually and on behalf of a class of similarly situated persons defined as follows (the "National Merchant Class"):

> **National RICO Merchant Class**: All merchants that, on or after August 13, 2016, paid money pursuant to a CBSG MCA Agreement marketed by Marketing Defendants and funded in whole or in part by Investor Defendants with an interest rate exceeding fifty (50%) in violation of Florida law where the Enterprise operated out of.

499.    Plaintiffs Odzer, Azrak and Shah (collectively the "Individual Plaintiffs") bring this action individually on behalf of a class of similarly situated persons defined as follows (the "National Individual Class," with the National Merchant Class, the "National Class"):

> **National RICO Individual Class**: All merchants who, on or after August 13, 2016, guaranteed a CBSG MCA Agreement marketed by Marketing Defendants and funded in whole or in part by Investor Defendants with an interest rate exceeding fifty (50%) in violation of Florida law where the Enterprise operated out of.

500.    Plaintiffs RKDK and Gelato, d/b/a Haagen Dazs franchises, bring this action individually and on behalf of a New Jersey subclass of similarly situated merchants defined as follows (the "New Jersey Merchant Subclass"):

> **New Jersey Merchant RICO Subclass**:  All merchants residing in New Jersey that, on or after August 13, 2016, paid money pursuant to a CBSG MCA Agreement marketed by Marketing Defendants and funded in whole or in part by Investor Defendants that charged a usurious interest rate exceeding one hundred percent (100%)

-94-

501.    Plaintiff Shah brings this action individually and on behalf of a class of similarly situated subclass of New Jersey residents defined as follows (the "New Jersey Resident Subclass"):

> **New Jersey Resident RICO Subclass:**  All individuals residing in New Jersey who, on or after August 13, 2016, guaranteed a CBSG MCA Agreement marketed by Marketing Defendants and funded in whole or in part by Investor Defendants that charged a usurious interest rate exceeding one hundred percent (100%).

502.    Plaintiff B&T brings this action individually and on behalf of similarly situated subclass of New York merchants defined as follows (the "New York Merchant Subclass"):

> **New York Merchant RICO Subclass:**  All merchants residing in New York that, on or after August 13, 2016, paid money pursuant to a CBSG MCA Agreement marketed by Marketing Defendants and funded in whole or in part by Investor Defendants with an interest rate exceeding fifty percent (50%).

503.    Plaintiff Odzer and Azrak bring this action individually and on behalf of similarly situated subclass of New York residents defined as follows (the "New York Resident Subclass", collectively the "Subclasses"):

> **New York Resident RICO Subclass:**  All individuals residing in New York who, on or after August 13, 2016, guaranteed a CBSG MCA marketed by Marketing Defendants and funded in whole or in part by Investor Defendants with an interest rate exceeding fifty percent (50%).

504.    The following people and entities are excluded from the Classes defined above:  (1) any Judge or Magistrate presiding over this action and members of their family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and timely file a request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the

-95-

merits with due process or otherwise released or waived; (5) Plaintiffs' and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded person or entity.

505.    **Numerosity**:  The exact number of members of the Classes is unknown and not available to Plaintiffs at this time, but individual joinder is impracticable.  Based on publicly available documents, each of the Classes likely number many hundreds or more merchants and/or individuals.

506.    Indeed, according to the SEC's Amended Complaint in the SEC Action, CBSG "has filed more than 2,000 lawsuits" against merchant borrowers and the individuals who guaranteed just those MCA Agreements that were subject to litigation. Ex. O ¶ 47.

507.    That is just those merchants and individuals who were sued.  Upon information and belief, many thousands more were preyed upon by the Enterprise using usurious MCA Agreements and wire fraud—schemes Defendants were fully appraised of before agreeing to fund the Enterprise's MCA Agreements.

508.    **Commonality and Predominance:**  There are many questions of law and fact common to the claims of Plaintiffs and the other Classes' members, and those questions predominate over any questions that may affect individual members of the Classes.  Common questions for the National, various State and Subclasses include, without limitation, the following:

     a)  Whether the MCA Agreements are disguised loans;

     b)  Whether the choice of law provisions in the MCA Agreements are enforceable;

     c)  Whether the MCA Agreements are usurious under Florida Law for the National Class and various other States for the Subclasses;

     d)  Whether the Class and Subclasses are entitled to treble damages under RICO;

     e)  Whether the Classes' MCA Agreements were funded in whole or in part by Defendants;

-96-

f)   Whether the Enterprise violated judgment collection laws of Florida or various other States in its use of confessions of judgment against the National Class; and

g)   Whether the Enterprise violated the Constitution's Due Process Clause in securing confessed judgments against the National Class and Subclasses.

509.   **Typicality:**  Plaintiffs' claims are typical of the claims of other members of the Classes.  Plaintiffs and the members of the Classes sustained damages as a result of the Enterprise's uniform collection of unlawful debt through usurious loans disguised as MCA Agreements with were funded in whole or in part by Defendants, as well as the wire fraud scheme described above.

510.   **Adequate Representation**:  Plaintiffs have and will continue to fairly and adequately represent the interest of the Classes and have retained counsel competent and experienced in complex RICO litigation and class actions.  Plaintiffs have no interests antagonistic to the those of the Classes, and Defendants have no defenses unique to Plaintiffs.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of all members of the Classes, and they have the resources to do so.  Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes.

511.   **Superiority:**  This case is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, it would be difficult, if not impossible, for the individual members of the Classes to obtain effective relief from Defendants.

512.   Even if members of the Classes themselves could sustain such individual litigation—which is unlikely since many members of the Classes had all of their business and personal assets taken by the Enterprise—a class action is still preferable because individual litigation would increase the delay and expense to all parties by the Court and require duplicative consideration of the legal and factual issues presented herein.

513.     By contract, a class action presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court.  Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

### FIRST CAUSE OF ACTION
**(Violations of 18 U.S.C. § 1962(d))**
_**By all Plaintiffs, The National Class & Subclasses against all Defendants**_

514.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

515.     Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated with members of the Enterprise to violate 18 U.S.C. § 1962(d) by the conduct of collection of unlawful debt and wire fraud as described above, in violation of 18 U.S.C. § 1962(d)

516.     By and through the Enterprise's marketing arm that was in repeated and direct contact with Defendants, and the Enterprise's and Defendants close coordination with one another in the affairs of the Enterprise, and frequent email communications and the Enterprise concerning the funding of the MCA Agreements Defendants were fully aware that were fraudulently disguised as loans which would charge at least 35% per loan of less than 100 days and more than 105% annually to a given borrower-victim, Defendants knew the unlawful nature of the Enterprise and its common goals of collecting upon unlawful debt and committing wire fraud by fraudulently trying to pass off MCA Agreements and purchase of receivables to borrowers like Plaintiffs and the Class, in violation of 18 U.S.C. § 1962(c).

517.     Defendants knew the Enterprise extended beyond each Enterprise member's individual role.  For instance, Defendants understood that members like Dean Vagnozzi and Better Financial Plan served as solicitors and marketers for the Enterprise explicitly tasked with inducing

-98-

Defendants into funding the fraudulent and usurious loans disguised as MCA Agreements that would be sent and collect upon using interstate wires.

518.    The Eckert Defendants, for their part, explicitly mention they were working with Dean Vagnozzi and Better Financial Plan to find investors like the other Defendants to fund the RICO Enterprise.  Ex. 25.  As the SEC alleges: "[Dean] Vagnozzi, with Pauciulo's assistance, created a turnkey operate to create the Agent Funds [i.e., the SPV Defendants]."  Ex. 26 ¶ 10.

519.    The SEC succinctly describes how the Eckert Defendants conspired with the Enterprise in helping to raise funds for the usurious loans fraudulently disguised as MCA Agreements:  "Pauciulo provided legal representation for one of the sales agents, [Dean] Vagnozzi, who raised more than $100 million from investors into CBSG through at least seven private investment funds (the 'Vagnozzi Agent Funds'), and Pauciulo also provided legal representation for at least 25 other private investment funds formed to raise money for CBSG. . . . The Agent Funds raised money from investors to be invested in CBSG's merchant cash advance business."  *Id*. ¶ 8.

520.    The SEC's Cease-and-Desist order against Pauciulo also mentions the wealth all Defendants reaped for their participation in funding the CBSG Enterprise:  "The Agent Funds [i.e., the SPV Defendants] paid lesser returns to investors, ranging from 8% to 12% interest, and kept as their compensation the 'spread' between the 20% received from CBSG and the 8% to 12% interest the Agent Funds paid investors."  *Id*. ¶ 9.

521.    During Pauciulo's involvement as a conspirator with the Enterprise, he "served as the chair of his law firm's [Eckert's] Financial Transactions Group."  *Id.* 19.  Given Pauciulo's prominent role and position as partner at Eckert during the relevant time frame before being fired in disgrace as a result of the SEC's cease-and-desist order, he performed all of these tasks and

fundraising activities for the Enterprise with Eckert's knowing assistance, and Pauciulo relied on Eckert's recourses as a large law firm to assist in his and other Defendants' scheme to additional solicit co-conspirators to explicitly fund the Enterprise's unlawful debt collection and wire fraud activities.

522.    Defendants also understood that Dean Vagnozzi, Better Financial Plan and the Eckert Defendants were representatives of Enterprise member CBSG given that explicit explanation in the marketing materials Defendants relied upon.  Defendants further understood, by their additional due diligence and review of Enterprise materials, that CBSG was operated by additional Enterprise members, such as McElhone, Barleta and LaForte.

523.    Defendants each agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs by being the critical funders of the MCA Agreements by which the Enterprise would collect unlawful debts, in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs and agreed to conspire with the Enterprise in its goal of collecting unlawful debt through the use of MCA Agreements that Defendants were explicitly told would be funded with their capital and they would receive lucrative returns on their investments because the Enterprise would charge "at least 35%" on a single "loan" to a borrower with a term of 100 days or less, and that this same usurious loan would be extended at least three times in a given year to the borrower, yielding total annual interest rates of at least 105%, which violates every state that has usury laws among the United States, including Florida where the Enterprise operated out of.





524.     Defendants further agreed to facilitate, conduct, and participate in the conduct, management or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  Specifically, each Defendant was told repeatedly that the MCA Agreements were "loans" that would be negotiated and executed using interstate wires with borrowers across the United States, and that the MCA Agreements were be repaid using interstate ACH debits.

525.     Defendants also conducted their due diligence by reviewing the MCA Agreements they would be funding that were to be sent and collected upon using interstate wires, and saw fraudulent language, like that reproduced below, that fraudulently described the MCA Agreements not as loans, but as purchases of "receivables," a concept never once raised in any of the marketing materials Defendants relied upon before agreeing to invest in the Enterprise's MCA Agreements.

-101-

u.  **Purchase Agreement.**  This Agreement for the Purchase and Sale of Future Receivables, any and all documents executed in connection herewith as a condition precedent to its effectiveness, and any and all exhibits incorporated herein by reference.

b.  The Purchase Price is being paid in exchange for the purchase and sale of the Receivables and is not intended to be, nor shall it be construed as, a loan from Purchaser to Merchant Seller. Merchant Seller agrees and acknowledges that the Purchase Price represents the fair market value of the Receivables. Purchaser has purchased and shall own all the Receivables up to the total RPA as the Receivables are created.  Payments made to Purchaser towards the total RPA shall be conditioned upon (i) Merchant Seller's sale of products and/or services and (ii) the payment of such goods and/or services to Merchant Seller by its customers pursuant to the terms of this Purchase Agreement.

c.  In no event shall any amounts paid to or received by Purchaser (or any portion of any such amount) be construed as or considered to be interest (with the exception of any interest awarded pursuant to any judgment entered against Merchant Seller for a breach of this Purchase Agreement).  In the event that any court of competent jurisdiction determines that Purchaser has improperly charged or received interest under this Purchase Agreement and that said amount is in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and Purchaser shall promptly refund to Merchant Seller any interest Purchaser received in excess of the maximum lawful rate.  It is Merchant Seller's intent that it not pay or contract to pay and that Purchaser not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant Seller under applicable law.

526.     As held in a decision by the PA *CBSG* Action, fraudulent statements like the above coupled with the interstate activities associated therewith, namely the interstate wires to negotiate and execute the MCA Agreements and interstate ACH debits the Enterprise used to collect the unlawful debt, constitutes wire fraud for the purposes of 18 U.S.C. § 1962(c).

527.     The participation and agreement of Defendant and each Enterprise member was necessary to allow the commission of this scheme.  Indeed, the top mastermind of the Enterprise, LaForte, was a convicted felon on multiple counts by the time the Enterprise was fully operational in 2012 and LaForte would have been completely unable to launch the Enterprise's goal of collecting unlawful debt *unless* he and the Enterprise had co-conspirators like Defendants to raise hundreds of millions of dollars to fund the MCA Agreements, which Defendants readily agreed to do so even after being told these were loans with annual usurious interest rates of at least 105%.

528.     Plaintiffs and the Classes have been and will continue to be injured in their business and property by reason of Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at a hearing, but believed to be more than $600 million at a minimum.

529.     The injuries to the Plaintiffs and Classes directly, proximately, and reasonably foreseeably resulting from or causing these violations of 18 U.S.C. § 1962(d) include, but are not limited to, improperly collected loan payments, lost customers, loss of goodwill, and lost profits. Plaintiffs and the Classes were forced to make daily or weekly onerous and unconscionable payments pursuant to MCA Agreements funded by Defendants that, as Defendants knew before investing in the Enterprise, amounted to usurious interest rates of every State in the United States that imposes usury laws, including Florida where the Enterprise operated out of.

530.     Plaintiffs and members of the Classes have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting the Enterprise's criminal activities funded by Defendants, and defending themselves from lawsuits and confessed judgments by the Enterprise filed after purported defaults on the MCA Agreements Defendants funded knowing the MCA Agreements were actually usurious loans and not legitimate purchase of receivables they were held out to be in the text of the MCA Agreements.

531.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the Classes are entitled to treble damages, plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION
### (Equitable Relief in the form of Preliminary Injunction)
### By all Plaintiffs, The National Class & Subclasses against all Defendants

532.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

533.     To obtain a preliminary injunction, Plaintiffs must establish that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in their favor, and that an injunction is in the public interest.

-103-

534.     Here, Plaintiffs are more than likely to succeed on the merits that Defendants knowingly and deliberately funded usurious loans for the Enterprise.  As described above, Defendants fully understood that the MCA Agreements were loans that violate 18 U.S.C. § 1962(c) because Defendants were told before agreeing to fund the Enterprise's MCA Agreements that these loans would charge annual rates of at least 105%, more than double the limit of every State that has usury laws, including the state of Florida where the Enterprise operated out of.

535.     Moreover, the Enterprise's MCA Agreements have already been determined to be usurious loans by government authorities and various Courts.  For instance, the SEC has taken the position that the Enterprise "is in the business of making opportunistic loans – some of which charged more than 400% interest – to small businesses across America."  Ex. 15 ¶ 1.

536.     Plaintiffs will also suffer irreparable harm in the absence of injunctive relief.  As explained above, the Enterprise's assets are presently being presided over the SEC Receiver who has denied every single claim by every and all MCA Agreement borrowers for compensation for their damages submitted to the SEC Receiver and stayed and is actively seeking to dismiss all lawsuits brought by Plaintiffs against the Enterprise.  The SEC Receiver is, instead, exclusively prioritizing the concerns of non-Defendant investors of the Enterprise to ensure they obtain first and only recover from the assets of the Enterprise that are in the receivership.

537.     While the present Defendants are not part of the receivership in the SEC Action, they are still seeking monies from the receivership estate and there is nothing in Plaintiffs' current power to intercede to stop Defendants from further enriching themselves after Defendants were already rewarded with receiving returns from the Enterprise in exchange for their conscious funding of the Enterprise's usurious loans through submitting claims to the SEC Receiver.

538.     What is more, given the criminality and sophistication of the Defendants, there is no mechanism presently in place to prevent Defendants from transferring the sums they received from the Enterprise and sums they may be paid out by the SEC Receiver to extraterritorial jurisdictions where these sums cannot be recovered from.

539.     Thus, Plaintiffs respectfully ask that this Court issue a preliminary injunction mandating that all of the Defendants current assets and any future assets they may obtain from the SEC Receiver be placed with this Court in escrow until this matter is resolved on the merits.

540.     The balance of the equities also clearly weighs in favor of Plaintiffs and the Class. Whereas Defendants invested more than $500 million with the Enterprise to fund the usurious loans disguised as MCA Agreements in exchange for lucrative returns on their investment, Plaintiffs and the Class were devastated by these MCA Agreements to the point of having their business and personal bank accounts drained by the Enterprise, their homes foreclosed or threated to be foreclosed upon, having fraudulent and sometimes forged confessions of judgment entered against them by the Enterprise for purported defaults under the MCA Agreements, and were often terrorized by the Enterprise's enforcers like James LaForte and Gioe.

541.     Thus, whatever harm or, more likely, imagined harm by Defendants to the extent their knowing investment in the Enterprise's unlawful schemes did not yield a return of the magnitude they were expecting from the Enterprise's promises, it pales in comparison to the harm undeniably experienced by Plaintiffs and the Classes.

542.     To be sure, James LaForte and Gioe never knocked on any of the Defendants' doors and threatened their lives because the Defendants were investors and allies in the Enterprise, they were not the Enterprise's intended victims like Plaintiffs and the Class.

-105-

543.    Finally, a preliminary injunction is in the public interest.  Indeed, Plaintiffs and the Classes they represent constitute thousands of small businesses and their owners across the United States who were financially and emotionally devastated by the Enterprise's collection efforts in connection with the MCA Agreements Defendants funded knowing they charged highly usurious interest and fraudulently claimed to be purchases of receivables when the Enterprise made clear that the MCA Agreements were and would be treated as absolutely repayable loans.

544.    Moreover, while this Enterprise's unlawful practices have been recently effectively stopped through the efforts of law enforcement, there remain numerous other predatory lenders embedded in the unregulated MCA industry and given Defendants' conduct, there is nothing to suggest that they would not continue to invest in other predatory MCA lenders unless the distribution of their assets and future assets from the SEC receivership estate are enjoined and deposited with this Court.

545.    For these reasons, Plaintiffs and the Class respectfully seeking a preliminary injunction requiring that all of the Defendants deposit their assets and any future assets obtained from the SEC Receiver into an escrow account with this Court so as to preserve the funds which could make Plaintiffs and the Classes whole due to the unlawful conduct of the Enterprise and Defendants.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs B and T Supplies, Inc. d/b/a B and T Supply d/b/a Biggest Book.com, Tzvi Odzer, Ruben Azrak, RKDK Inc. and Gelato on Hudson LLC d/b/a Haagen Dazs franchises, Asia Star Broadcasting Inc. and Daniel Shah, individually and on behalf of those similarly situated, request judgment be entered in their favor and against Defendants AG Morgan Tax & Accounting LLC, AGM Capital Fund I, LLC, AGM Capital Fund II LLC, Alvin Holdings,

LLC, Richard K. Armon, Blue Stream Income Fund, LLC, Cape Code Income Fund, LLC, Capricorn Income Fund I, LLC, Capricorn Income Fund I Parallel, LLC, Daniel A. Cistone LLC, ES Equity LLC, Fran Cassidy, GR8 Income Fund, LLC, Robert Hughes, Jade Fund, LLC, Jacalyn Kerbeck, Jax Fund, LLC, Lindsay Blake Inc., LWM Equity Fund LP, LWM Income Fund 2, LLC, LWM Income Fund Parallel, LLC, Mariner MCA Income Fund, LLC , Matthew Milstead, MCA Capital Fund, LLC, MCA Carolina Income Fund, LLC, MCA National Fund, LLC, Merchant Factoring Income Fund, LLC, Merchant Services Income Fund, LLC, Merchant Services Income Fund Parallel, LLC, Mid-Atlantic Brokers, Inc., Mid-Atlantic MCA Fund, LLC, M.K.One Income Fund, LLC, Daniel O'Neill, Pisces Income Fund, LLC, Pisces Income Fund Parallel, LLC, PTK Financial, LLC , Razr MCA Fund, LLC, Retirement Evolution Insured Income Fund LLC, Sherpa Income Fund 1, LLC, Spartan Income Fund, LLC , Spartan Income Fund Parallel, LLC , STFG Income Fund, LLC, Caetrina Talbot, Victory Income Fund, LLC, Wellen Fund 1, LLC, WorkWell Fund I LLC, Alec Vagnozzi, Albert Vagnozzi, Dean J. Vagnozzi, GemJ Chehebar Grat, LLC, Josef Chehebar, Isaac Shehebar, Eckert Seamans Cherin & Mellot, LLC and John J. Pauciulo, jointly and severally, and respectfully request entry of an order from this Honorable Court:

a) Certifying this case as a class action on behalf of the Classes defined above and appoint Plaintiffs as Class representatives and appoint their undersigned attorneys as class counsel;

b) Declaring that the MCA Agreements funded by Defendants and entered into between the Enterprise and the Class members constitute a loan transaction, and thus, are void because each intended and did charge criminally usurious interest rates in excess of that allowed by Florida law and the various other States that Plaints and Subclasses reside;

c) Ordering Defendants to make the Plaintiffs and Classes whole for the damages they suffered at the hands of the Enterprise's MCA Agreements funded by Defendants, including prejudgment interest;

d) Granting an injunction against Defendants enjoining them from transferring or trying to dispose of their assets that should be reserved in escrow with the Court pending resolution of this matter;

e) Awarding the Plaintiffs and Class members direct and consequential damages;

f) Awarding Plaintiffs and the Class members treble damages pursuant to 18 U.S.C. § 1964(c);

g) Awarding Plaintiffs and the Class members their attorney's fees and costs incurred in this action pursuant to 18 U.S.C. § 1964(c) and

h) Granting such other and further relief as this Court deems just and proper.


Date: December 28, 2023

ALMEIDA LAW GROUP LLC

_/s/ David S. Almeida_____
David S. Almeida, *Esq.* (NY Bar # 3046520)
Matthew Langley, *Esq.* (NY Bar # 4080891)
Elena A. Belov (NY Bar # 4080891)
849 W. Webster Avenue
Chicago, Illinois 60614.
(312) 576-3024
david@almeidalawgroup.com
matt@almeidalawgroup.com
elena@almeidalawgroup.com

*Counsel for Plaintiffs*

-108-